UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re BISYS SECURITIES LITIGATION

MASTER DOCKET

This document relates to: ALL ACTIONS

04 Civ. 3840(LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Peter S. Linden
Ira M. Press
KIRBY MCINERNEY & SQUIRE LLP

S. Gene Cauley
Allen J. Carney
Marcus Bozeman
Tiffany Wyatt Oldham
CAULEY BOWMAN CARNEY & WILLIAMS,
PLLC

*Attorneys for Plaintiffs*

Jerome S. Hirsch
Lea Haber Kuck
Elizabeth A. Hellerman
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
*Attorneys for Defendant The BISYS Group, Inc.*

Thomas J. Kavaler
Joel Kurtzberg
CAHILL GORDON & REINDELL LLP
*Attorneys for Defendants Dennis R. Sheehan,
Lynn J. Mangum, Andrew C. Corbin, James L.
Fox, Russell Fradin, Kevin Dell, and Mark J.
Rybarczyk*

James J. Capra
David M. Fine
Elizabeth S. Watson
ORRICK, HERRINGTON & SUTCLIFFE LLP
*Attorneys for Defendant
PricewaterhouseCoopers LLP*

LEWIS A. KAPLAN, *District Judge.*

On May 17, 2004, The BISYS Group, Inc. ("BISYS" or the "Company") announced plans to restate its financial results for fiscal years 2001, 2002, and 2003 and its interim results for fiscal year 2004.[1] Plaintiffs then brought this putative class action against BISYS, seven of its current and former officers and directors (collectively, the "Individual Defendants"),[2] and its independent auditor, PricewaterhouseCoopers LLP ("PwC"). Plaintiffs seek recovery against all defendants under Sections 10(b) of the Securities Exchange Act of 1934[3] (the "Exchange Act") and Rule 10b-5 thereunder.[4] They assert an additional claim against the Individual Defendants under Section 20(a) of the Exchange Act.[5] The case is before the Court on motions by BISYS, the Individual Defendants, and PwC to dismiss plaintiffs' Consolidated Amended Complaint ("Complaint").

## I. Facts

The Co-Lead Plaintiffs in this action are the Public Employees Retirement Association of New Mexico, the State of New Mexico Educational Retirement Board, and the New Mexico State

---

[1]
    Consolidated Amended Complaint ("Cpt.") ¶ 90.

[2]
    The Individual Defendants are: (1) Dennis R. Sheehan, former chief financial officer, president, chief operating officer, and chief executive officer; (2) Lynn J. Mangum, former chairman and chief executive officer; (3) Andrew C. Corbin, former chief financial officer; (4) James L. Fox, former chief financial officer; (5) Russell Fradin, current president and chief executive officer; (6) Kevin Dell, current executive vice president, general counsel, and secretary; and (7) Mark J. Rybarczyk, current executive vice president of human resources.

[3]
    15 U.S.C. § 78j(b).

[4]
    17 C.F.R. § 240.10b-5 (2005).

[5]
    15 U.S.C. § 78t(a).

Investment Council. They purport to represent a class of all individuals and entities who purchased BISYS securities between October 23, 2000 and May 17, 2004 (the "Class Period").

BISYS is a Delaware corporation that provides outsourcing services to financial institutions and other corporations. It operates through three separate business groups: BISYS Insurance and Education Services, BISYS Investment Services, and BISYS Information Services.[6] This action and the accounting restatement it is based upon relate only to the first of these three groups, BISYS Insurance and Education Services (the "Insurance Services Group"), which, among other things, distributes life insurance and commercial property/casualty insurance products issued by various insurance companies.[7]

According to plaintiffs, problems in the Insurance Services Group began to emerge in September and October 2003, when the Company announced that chief executive officer Dennis Sheehan and chief financial officer Andrew Corbin were resigning and that earnings for the current fiscal period would be twenty to thirty percent lower than the Company had predicted previously. BISYS attributed the reduction to shortfalls in the Insurance Services Group.[8] The following April, BISYS announced the resignation of Jose Suquet, president of the Insurance Services Group.[9] Two weeks later, on April 22, 2004, BISYS revealed that it would take a one-time $24.7 million charge in order to counterbalance past revenues that had been recognized prematurely as commissions

---

[6] Cpt. ¶ 2.

[7] *Id.*

[8] *Id.* ¶¶ 6-7.

[9] *Id.* ¶ 7.

receivable in the Insurance Services Group.[10]  Then, on May 17, 2004, BISYS announced that it

planned to increase the $24.7 million charge to approximately $70 to $80 million and that this change

would require the Company to restate its financial results for the fiscal years ending June 30, 2001,

2002, and 2003 and the interim financial results for fiscal year 2004.[11]  In the press release, James Fox,

who then was BISYS' executive vice president and chief financial officer explained,

> "[t]he adjustment to commissions receivable in our Life Insurance division is larger
> than we had previously anticipated, and after further analysis requires that we restate
> our previously reported results to appropriately reflect the impact of the adjustment on
> prior periods."[12]

On June 16, 2004, BISYS issued its Form 10-Q for the quarter ending March 31, 2004, which

disclosed that the restatement of commissions receivable announced on May 17, 2004 would total $80

million and that the Company would make a further adjustments of approximately $21 million.  In a

press release issued the same day, BISYS announced that the restatement had put it in breach of its

financial covenants with lenders and had sparked an investigation by the SEC.[13]

Ultimately, BISYS' restatement included more than $100 million of adjustments.[14]  Its

after tax effect was to reduce BISYS' originally reported net income for fiscal years 2001, 2002, and

---

[10]

     *Id.* ¶ 8.

[11]

     *Id.* ¶ 9.

[12]

     *Id.* ¶ 90.

[13]

     *Id.* ¶ 93.

[14]

     *Id.* ¶ 10.

2003 from $312.8 million to $254 million, or $58.8 million. Put another way, the net income that BISYS reported during those three years had been overstated by approximately 23 percent.[15]

The restatement was intended to correct three main accounting problems. First, during the years at issue, BISYS improperly had reported revenue stemming from certain insurance sales commissions in the Insurance Services Group's Life Insurance Division before the revenue actually was realized. This premature recognition of commissions receivable revenues resulted in approximately 77 percent of the restatement, or about $80 million.[16] Second, BISYS had accounted improperly for goodwill and deferred taxes in companies recently acquired by the Insurance Services Group's Life Insurance Division. For example, BISYS recorded revenues that had been earned by companies it acquired prior to the acquisitions as revenues of BISYS rather than as accounts receivable as of the dates of the acquisition. Roughly twenty percent of the restatement, approximately $21 million, was intended to correct this problem.[17] Finally, BISYS had accounted improperly for agent commissions payable in the Life Insurance Division, which resulted in the remaining three percent of the restatement, or about $2.6 million.[18]

Plaintiffs now allege that BISYS, the Individual Defendants, and PwC intentionally or recklessly misrepresented BISYS' original financial results in order to inflate the Company's share

---

[15]    *Id.* ¶ 3.

[16]    *Id.* ¶¶ 106, 109, 111, 114.

[17]    *Id.* ¶¶ 106, 109, 111, 117-18.

[18]    *Id.* ¶¶ 106, 109, 111.

price.[19] This artificial inflation, plaintiffs claim, permitted BISYS to secure favorable credit terms and to use its overpriced stock as consideration in the acquisition a number of other companies during the Class Period. It further enabled the Individual Defendants to sell personally owned BISYS shares at high prices for proceeds of more than $60 million.[20] According to plaintiffs, the Individual Defendants were motivated also by the desire to increase the sizes of their compensation packages, which depended, at least in part, on the performance of their business sector.[21]

## II. Pleading Standards

In deciding a Rule 12(b)(6) motion, the Court accepts as true the well-pleaded allegations in the complaint and draws all reasonable inferences in the plaintiffs' favor.[22] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[23]

---

[19]

    *Id.* ¶ 4.

[20]

    *Id.* ¶ 5.

[21]

    *Id.* ¶ 153.

[22]

    *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 10541 (2002) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994)).

[23]

    *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

### III.   Plaintiffs' Section 10(b) Claims

#### A.   Pleading Requirements

Section 10(b) makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Rule 10b-5 in turn provides:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> "(a)    To employ any device, scheme, or artifice to defraud,
>
> "(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security."[24]

To state a claim based on a misrepresentation or omission in violation of Rule 10b-5, as plaintiffs purport to do here, one must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[25]

---

[24]    17 C.F.R. § 240.10b-5 (2005).

[25]    *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998) (internal quotation marks omitted)), *cert.*

These allegations must satisfy Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), which require that a plaintiff specify the statements that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent.[26] Further, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[27] The required state of mind is "an intent to deceive, manipulate, or defraud."[28] Finally, if an allegation is based on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."[29]

B.      Alleged Misstatements

The Complaint quotes from nearly every public filing and press release issued by BISYS during the Class Period and asserts that the restatement is an admission that these filings and press releases misrepresented BISYS' true financial condition. BISYS argues that these allegations

---

denied, 74 U.S.L.W. 3026 (Oct. 11, 2005) (No. 05-24); accord Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000)

[26]     Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.) cert. denied, 531 U.S. 1012 (2000); accord In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir.), cert. denied, 534 U.S. 1071 (2001).

[27]     15 U.S.C. § 78u-4(b)(2).

[28]     Ganino, 228 F.3d at 168 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976) (internal quotation marks omitted)); accord Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001).

[29]     15 U.S.C. § 78u-4(b)(1). The requirement of stating "all facts" is not applied literally. See Novak, 216 F.3d at 313-14.

are not sufficiently particularized because plaintiffs fail to specify which figures in the financial statements were false and to explain why those figures were misleading.

BISYS' argument, for the most part, is without merit. Pursuant to Generally Accepted Accounting Principles ("GAAP"), previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were issued.[30] As another court in this district has explained, "[a]lthough a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false and misleading."[31] The Complaint therefore alleges adequately that the financial statements and press releases issued during the Class Period were false to the extent they reported, discussed, or analyzed figures that subsequently were restated as well as any financial statistics derived from restated figures. This, however, is not a complete answer to this aspect of the motion.

As BISYS points out, a number of the alleged statements quoted in the Complaint, especially those taken from BISYS press releases, do not relate to the financial figures that BISYS restated or to the business group from which the restated financials originated. For example, plaintiffs quote from press releases discussing the impact on the Company's business of the September 11 terrorist attacks, the growth in the Company's Investment Services Group, a new stock buy-back program authorized by BISYS' Board of Directors, and the fact that a number of new clients recently

---

[30] Cpt. ¶ 108 (citing Accounting Principles Board Opinion No. 20); *In re Atlas Air WorldWide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 486 (S.D.N.Y. 2004).

[31] *In re Atlas Air,* 324 F.Supp.2d at 486 (citing *In re Cylink Sec. Litig.,* 178 F.Supp.2d 1077, 1084 (N.D. Cal. 2001) ("the mere fact that . . . statements were restated at all" is sufficient to establish falsity at the pleading stage)).

had purchased the Company's bank outsourcing services.[32] Plaintiffs have alleged no facts indicating that these statements – or any others that do not relate to the restated financials – were false or misleading. Accordingly, to the extent that plaintiffs cite statements by defendants that do not report, relate to, or discuss aspects of the financials that subsequently were restated, they have not alleged falsity with the particularity required by Rule 9(b) and the PSLRA.

C.    The Group Pleading Doctrine

Although plaintiffs assert that several of the Individual Defendants signed allegedly misleading financial reports and personally made statements that were relayed to the public through BISYS press releases, they make no such allegations with respect to other Individual Defendants. Instead, they rely on the group pleading doctrine, asserting that "[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's filings, press releases and other publications . . . are the collective actions of [all of the Individual Defendants]."[33]

The group pleading doctrine developed in consequence of the rigors of Rule 9(b), which requires that averments of fraud be made with particularity. Recognizing that plaintiffs charging fraud with respect to corporate utterances seldom have access, prior to the commencement of discovery, to information permitting identification of the particular officers, directors and employees who bear personal responsibility for the utterances in question, courts developed the

---

[32]    Cpt. ¶¶ 48, 51, 56, 71.

[33]    *Id.* ¶ 26.

doctrine to permit plaintiffs, for pleading purposes only, to

> "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company. This allows plaintiffs, to a limited extent, to circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent."[34]

BISYS and the Individual Defendants argue that the group pleading doctrine has been abrogated by the enactment of the PSLRA. They rely principally on *Southland Securities Corp. v. INSpire Insurance Solutions Inc.,*[35] in which the Fifth Circuit held that the group pleading doctrine

> "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'"[36]

1.      *The Effect of the PSLRA*

With respect to the Fifth Circuit and my colleagues, I find defendants' contention unpersuasive. Congress enacted the PSLRA in 1995 to deter strike suits based on meritless allegations

---

[34]

> *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 22 n.26 (S.D.N.Y. 2004) (internal quotations and citations omitted).

[35]

> 365 F.3d 353 (5th Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)).

[36]

> *Id.* at 364-65. *Accord In re Cross Media Market Corp. Sec. Litig,* 314 F.Supp.2d 256, 262 (S.D.N.Y. 2004) (the PSLRA's "use of the singular 'defendant' counsels against group pleading in actions arising in securities fraud cases since the enactment of the [statute]"); *Bond Opportunity Fund v. Unilab Copr.,* No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (noting that "the PSLRA has eliminated the 'group pleading' doctrine."), *aff'd,* 87 Fed. Appx. 772 (2d Cir. 2004) (affirming the district court's decision without reaching the issue of group pleading).

of securities fraud.[37]  To this end, it imposed mandatory discovery stays on securities actions filed in

federal court and established uniform, stringent pleading requirements in such cases.[38]  But nothing

in the statutory text or, for that matter, its legislative history addresses the group pleading doctrine,[39]

which was an established feature of federal securities law well before enactment of the PSLRA.[40]

Proper respect for Congress cautions against imputing to it an intention to change the law in such

circumstances.[41]  Indeed, although defendants cite a handful of cases finding that the group pleading

doctrine did not survive the enactment of the PSLRA, the majority of courts in this and other

jurisdictions have found that the doctrine is alive and well.[42]

---

[37]

*Novak*, 216 F.3d at 306.

[38]

*Id.*

[39]

Indeed, the Fifth Circuit conceded in *Southland Securities* that the PSLRA makes no explicit reference to the group pleading doctrine and certainly "does not explicitly abolish the doctrine."  365 F.3d at 365.

[40]

*See, e.g., DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987); *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir. 1986).

[41]

*Jama v. Immigration and Customs Enforcement,* 125 S.Ct. 694, 715 (2005) (refusing to infer that Congress intended to change substantive law absent any evidence of such an intent in statute's text or legislative history) (citing *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50 (2004)).

[42]

*In re NTL,* 347 F.Supp.2d at 22 n.26 (noting that the group pleading doctrine "remains available after the enactment of the PSLRA); *In re American Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 442 (S.D.N.Y. 2000) ("It is well settled that plaintiffs may engage in so-called group-pleading under 10(b) and Rule 10b-5; nothing in the PSLRA has altered that doctrine.");  *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y. 1999) ("This Court agrees that the PSLRA has not altered the group pleading doctrine."); *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 219 (S.D.N.Y. 1999) (rejecting the defendants' argument that the group pleading doctrine is no longer good law in light of the PSLRA); *In re Solv-Ex Corp. Sec. Litig.* 210 F.Supp.2d 276, 283 (S.D.N.Y. 2000) ("The PSLRA has not abolished the use of group pleading in Section 10(b) cases."); *Schnall v.*

Nor is the rationale of the *Southland Securities* court compelling. The Fifth Circuit

there reasoned that the group pleading doctrine conflicted with the *scienter* requirement of the PSLRA

"because, even if a corporate officer's position supports a reasonable inference that he likely would

be negligent in not being involved in the preparation of a document or aware of its contents, the

PSLRA state of mind requirement is severe recklessness or actual knowledge."[43] But the group

pleading doctrine has no effect on the PSLRA's *scienter* requirement. It merely gives plaintiffs the

benefit of a presumption that certain kinds of statements were made by certain kinds of defendants.

It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged

misstatements were made.[44] As Judge Swain explained in *In re Citigroup, Inc. Securities Litigation,*[45]

---

*Annuity and Life Re (Holdings), Ltd.,* No. 3:02 CV 2133 (GLG), 2004 WL 515150, at *4 (D.Conn. Mar. 9, 2004) ("Although the group pleading doctrine was adopted before the PSLRA was enacted, district courts in the Second Circuit have concluded that . . . [the PSLRA does not] affect the vitality of this doctrine."); *In re McLeodUSA, Inc.,* No. C02-001-MWB, 2004 WL 1070570, at *4 (N.D. Iowa Mar. 31, 2004) ("Although there has been some debate as to whether the [PSLRA] abolished this doctrine, . . . a majority of the federal courts addressing the issue have determined that the group pleading doctrine has in fact survived the passage of [the PSLRA]."); *In re JDN Realty Corp. Sec. Litig.,* 182 F.Supp.2d 1230, 1250 (N.D. Ga. 2002) ("Although the Eleventh Circuit has not addressed this issue, this Court, with one exception, has held that the group pleading doctrine survived the enactment of the PSLRA.") (collecting cases); *In re Raytheon Sec. Litig.,* 157 F.Supp.2d 131, 153 (D. Mass. 2001) ("[T]his Court agrees with the majority of courts that have held that the rationale behind the group pleading doctrine remains sound in the wake of the passage of the PSLRA.") (collecting cases); *see also* THOMAS LEE HAZEN, LAW OF SECURITIES REGULATION § 12.13 (2005) ("Most courts have continued to recognize the group pleading doctrine in the wake of the Private Securities Litigation Reform Act of 1995.") (collecting cases).

[43]

365 F.3d at 365.

[44]

*DiVittorio,* 822 F.2d at 1247 (reliance on the group pleading doctrine does not satisfy the pleading requirements of Rule 9(b) because a plaintiff still must allege "particular facts demonstrating the knowledge of defendants at the time that such statements were false"); *In re Bayer AG Sec. Litig.,* No. 03 Civ. 1546 WHP, 2004 WL 2190357, at * 15 (S.D.N.Y. Sep. 30, 2004) (plaintiffs invoking the group pleading doctrine "must still establish scienter as to each defendant"); *Jacobs v. Coopers & Lybrand,* L.L.P., No. 97 Civ. 3374 (RPP), 1999

"[a]lthough the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made."

The *Southland Securites* court concluded also that the PSLRA's "references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is inconceivable that Congress intended liability to depend on whether they were all sued in a single action or were each sued alone in separate actions."[46] But this is unpersuasive as well. The group pleading doctrine does not depend on whether defendants are sued in separate actions or in a single action. It simply recognizes, solely for pleading purposes, that some corporate documents, including SEC filings and the like, generally are not created by a single author, but by a group of corporate insiders involved in the daily management of a company. Put another way, the group pleading doctrine allows a plaintiff to attribute certain documents to a corporate insider, regardless of whether that insider is the only defendant in the suit or one of many.[47]

---

WL 101772, at *17 (S.D.N.Y. 1999) ("[E]ven under the group pleading doctrine, a complaint must allege . . . 'particular facts demonstrating the knowledge of each of the defendants at the time that the statements were false.'") (quoting *ESI Montgomery County, Inc. v. Montenay Int'l Corp.,* No. 94 Civ. 0119, 1996 WL 22979, at *4 (S.D.N.Y. Jan. 23, 1996)).

[45] 330 F. Supp.2d 367, 381 (S.D.N.Y. 2004).

[46] 365 F.3d at 365.

[47] *See, e.g., Isanaka v. Spectrum Techs. USA, Inc.,* 131 F.Supp.2d 353, 361 (N.D.N.Y. 2001) (plaintiff could invoke the group pleading doctrine against the sole individual defendant named in the suit if plaintiff amended his complaint to add allegations that the defendant was a corporate insider).

Finally, even if this Court agreed with defendants, assessment of the effect of the PSLRA nevertheless would be bound by clear Second Circuit precedent establishing the group pleading doctrine. Any change in light of the PSLRA must come from our circuit.

### 2. Application

A plaintiff may invoke the group pleading doctrine against a defendant only if the plaintiff has alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company.[48]

Plaintiffs here have met this burden with respect to defendants Lynn Mangum, Kevin Dell, and Mark Rybarczyk. By virtue of their high level positions at the Company throughout the Class Period, the Court is bound to infer at this stage that all three had direct involvement in BISYS' daily affairs.[49]

Plaintiffs allege that the remaining four defendants – Dennis Sheehan, Andrew Corbin, James Fox, and Russell Fradin – held high level insider positions at the BISYS during some portion of the Class Period, but not the entire Class Period.[50] Accordingly, plaintiffs may invoke the group pleading doctrine against these five defendants only with respect to statements made during that portion of the Class Period that the particular defendant held a high level position with BISYS.[51]

---

[48]

    *In re NTL,* 347 F.Supp.2d at 22 n.26.

[49]

    Cpt. ¶¶ 17, 21, 22.

[50]

    *Id.* ¶¶ 16, 18-20.

[51]

    Specifically, plaintiffs can invoke the group pleading doctrine against Sheehan only with respect to statements made between the beginning of the Class Period and February 2004,

*D.*     Scienter

In order to satisfy the PSLRA and Rule 9(b), plaintiffs must allege with particularity that each of the defendants acted with the requisite *scienter*. This may be accomplished "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[52]

In alleging motive and opportunity, plaintiffs must demonstrate the presence of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged" as well as "the means and likely prospect of achieving concrete benefits by the means alleged."[53] To plead *scienter* based on conscious misbehavior, plaintiffs must allege facts supporting an inference that defendants deliberately or recklessly engaged in illegal conduct.[54] Recklessness is conduct that is highly unreasonable and "an extreme departure from the standards of

---

during which time he held a number of different positions at BISYS, including chief executive officer, chief operating officer, chief financial officer, and president. Plaintiffs can invoke the doctrine against Corbin only with respect to statements made between August 2001 and September 2003, during which time he served as the Company's chief financial officer. Plaintiffs can invoke the doctrine against Fox only with respect to statements made between September 2003 the end of the Class Period, during which time he served as the Company's chief financial officer. Plaintiffs can invoke the doctrine against Fox only with respect to statements made February 2004 and the end of the Class Period, during which time he served as the president and chief executive officer.

[52]

*Kalnit*, 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks omitted)); *accord Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004).

[53]

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994); *see also Novak*, 216 F.3d at 307.

[54]

*Novak*, 216 F.3d at 308.

ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[55] Allegations of defendants' knowledge of or access to contradictory information usually are sufficient to state a claim based on recklessness.[56]

### 1. Confidential Witness Statements

In their attempt to allege *scienter*, plaintiffs rely in large part on the statements of six unnamed former employees of BISYS. Where, as here, plaintiffs rely on confidential personal sources to support their allegations, they need not identify the sources by name, but they must describe each informant "with sufficient particularity to support the probability" that someone in the informant's position would possess the information alleged.[57] BISYS argues that plaintiffs have not met this burden. Accordingly, before considering whether plaintiffs have alleged *scienter* with respect to each of the defendants, the Court first must determine whether they may rely on the statements of the six confidential witnesses.

The Court finds that plaintiffs have met their burden with respect to three of the confidential witnesses. Plaintiffs have alleged that Confidential Witness One was "a former high-ranking finance department employee" who reported directly to BISYS' vice president of corporate finance.[58] An employee in such a position likely would have information about the alleged accounting

---

[55]

  *Id.* (internal quotations omitted)).

[56]

  *In re Scholastic,* 252 F.3d at 76.

[57]

  *Novak,* 216 F.3d t 314.

[58]

  Cpt. ¶¶ 127, 133.

practices to which the witness's statements relate. Similarly, Confidential Witness Two, whom plaintiffs have identified as a "former senior sales executive . . . who headed a BISYS office in the South,"[59] likely would have information about the subject of his or her statements, the alleged pressure on sales associates to book revenues prematurely. Finally, plaintiffs adequately have alleged that Confidential Witness Six, whose statement relates to the Company's commission accounting policies, would have had access to this information in his former position in the commission and audit section of BISYS' Insurance Services Group.[60]

Plaintiffs have not met their burden with respect to the remaining unnamed witnesses, whom they have identified only as two former BISYS sales executives and a "former fund accountant at BISYS."[61] Unlike the witnesses discussed above, plaintiffs have not alleged that any of these three informants held a particularly senior position at BISYS or worked in a division in which the fraud allegedly originated. Accordingly, the Court cannot infer that these witnesses possess the information contained in their alleged statements.

In determining whether plaintiffs have alleged *scienter*, then, the Court will consider the alleged statements of Confidential Witnesses One, Two, and Six, but not the remaining three confidential informants mentioned in the Complaint.

---

[59] *Id.* ¶ 129.

[60] *Id.* ¶ 136.

[61] *Id.* ¶¶ 131, 132, 137.

2.      BISYS

Plaintiffs have alleged three different accounting practices at BISYS: overstatement of revenues, overbooking of goodwill from acquisitions, and improper accounting for commissions payable.[62]   The Court will evaluate plaintiffs' allegations of *scienter* with respect to each.

First, with respect to the overstatement of commission revenues, plaintiffs allege that BISYS senior management intentionally adopted an accounting policy that inflated revenues from policy renewals after Sheehan told them, "We're a little short, let's accrue a little renewal money."[63] These senior managers allegedly ignored finance department employees who objected to this practice and asserted that the Company had "to hit the numbers" promised to industry analysts.[64]   Plaintiffs further allege that BISYS management, including the Company's regional vice president, intentionally "pressur[ed] sales representatives to artificially increase the amount of revenues booked from insurance policies."[65]   These allegations clearly are sufficient to give rise to a strong inference that BISYS intentionally overstated its revenues.

Turning to the alleged overbooking of goodwill, plaintiffs allege that BISYS and its senior managers consistently paid too much for acquisitions and then "dump[ed]" the excess payment into goodwill because "it overstated income and overstated receivables."[66]   Senior managers allegedly

---

[62]

    *Id.* ¶ 109.

[63]

    *Id.* ¶ 128.

[64]

    *Id.*

[65]

    *Id.* ¶ 129.

[66]

    *Id.* ¶ 135.

overstated the goodwill relating the to acquisition of one company by approximately $4 million dollars, even after Confidential Witness One complained about the purported overstatement.[67] Though plaintiffs have not identified precisely which senior managers allegedly devised and directed these improprieties, these allegations also are sufficient to give rise to a strong inference of conscious misconduct.[68]

With respect to the improper accounting for commissions payable, plaintiffs allege that Sheehan and Steve Wevedau, who was then vice president of corporate finance at BISYS, directed employees to falsify the amounts BISYS had to pay out to agents by "manually changing the records of the Company's subsidiaries."[69] These allegations also suffice.

Accordingly, plaintiffs adequately allege that BISYS knowingly and intentionally engaged in each of the three types of accounting manipulations alleged in the Complaint.

3.    *The Individual Defendants*

The next question is whether plaintiffs have alleged facts sufficient to give rise to an inference of *scienter* with respect to the seven Individual Defendants.

As discussed above, the Complaint alleges that defendant Sheehan knowingly directed BISYS employees to overstate revenues and to falsify commissions payable. These allegations give rise to an inference that Sheehan was guilty of deliberate wrongdoing with respect to two of the three

---

[67]

   *Id.* ¶ 134.

[68]

   It is far from clear from the Complaint how overstating goodwill – amortization of which is a charge against income – could overstate either income or receivables, as the Complaint seems to allege. As defendants have not raised this point, the Court does not rely upon it.

[69]

   Cpt. ¶ 136.

types of accounting manipulations at BISYS. They do not suffice, however, to establish Sheehan's *scienter* as to the third type of accounting impropriety, the overbooking of goodwill following acquisitions. Nor do they give rise to an inference of *scienter* as to any of the other six Individual Defendants. Accordingly, the Court must determine whether plaintiffs' remaining allegations suffice to create an inference of *scienter* as to Sheehan with respect to the overbooking of goodwill, and as to the other six Individual Defendants with respect to all three types of alleged manipulations.

### a) Motive and Opportunity

Plaintiffs claim that the Individual Defendants were motivated to manipulate BISYS' earnings in order to increase their own compensation and to inflate the price of the Company's stock so that five of the defendants – Sheehan, Mangum, Dell, Rybarczyk, and Corbin – could sell their own shares at high prices. Plaintiffs further allege that the alleged misrepresentations allowed the Company to secure favorable credit terms and use its inflated stock price to acquire other companies.

### 1) Executive Compensation and Favorable Credit Terms

The Individual Defendants' alleged desire to increase or maintain their compensation packages is insufficient to give rise to an inference of *scienter*.[70] So too is the Company's alleged desire to secure a favorable credit rating.[71] The Second Circuit has made plain that these and other

---

[70] *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *Shields*, 25 F.3d at 1130.

[71] *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 814 (2d Cir. 1996).

motives "possessed by most corporate directors and officers" are too generic to support an allegation of fraud.[72]

### 2) Insider Sales

Plaintiffs' allegation that Sheehan, Mangum, Dell, Rybarczyk, and Corbin sold BISYS shares for large profits during the Class Period requires more extensive analysis.

While allegations of insider trading may permit an inference of *scienter*, plaintiffs must allege also that the insider trades were unusual.[73]  In other words, the fact that insiders sold company stock, standing alone, does not give rise to an inference of *scienter*.  Instead, the Court must look for some indication that defendants were withholding information from the market so that they could profit from insider trades, either by selling shortly before the public disclosure of negative information or by buying prior to the publication of positive information.  A number of factors are relevant to this determination, including the amount of profit from the sales, the percentage of defendant's holdings sold, the number of insiders who sold stock, the timing of the sales in relation to the alleged misstatements, and any change in the volume of sales as compared to defendant's previous or

---

[72]

*Kalnit,* 264 F.3d at 139.

[73]

*In re Scholastic,* 252 F.3d at 74; *Rothman v. Gregor,* 220 F.3d 81, 94 (2d Cir. 2000); *In re Interpublic Sec. Litig.,* No. 02 Civ. 6527 (DLC), 2003 WL 21250682, at *11 (S.D.N.Y. May 29, 2003).

subsequent sales.[74]  There is no *per se* rule, however, that sale of a particular monetary amount or percentage of total holdings is unusual.[75]

Nothing in the Complaint indicates that the insider sales here were unusual.  Although plaintiffs assert that defendants' sales were "suspicious in timing,"[76] the facts alleged do not bear out this claim.  Defendants' sales appear to have been distributed fairly evenly throughout the Class Period, not clustered at its end, when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted.[77]  In fact, only two of the Individual Defendants – Dell and Rybarczyk – are alleged to have sold between September 2003, when plaintiffs claim that the "first crack[s] in the [Company's] facade" began to emerge,[78] and May 2004, when BISYS restated its financials.  Even their sales were not particularly large or particularly close in time to any significant event at BISYS.

Further, although plaintiffs allege that the five defendants sold a large number of shares during the Class Period,[79] they do not provide any information about what portion of their respective

---

74

    *In re Scholastic,* 252 F.3d at 74-75; *Rothman,* 220 F.3d at 94-95; *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 85 (2d Cir. 1999); *Acito,* 47 F.3d at 54; *In re Quintel Entm't, Inc. Sec. Litig.,* 72 F.Supp.2d 283, 296 (S.D.N.Y. 1999).

75

    *In re Scholastic,* 252 F.3d at 75.

76

    Cpt. ¶ 151.

77

    *Id.*

78

    *Id.* ¶ 75.

79

    Specifically, plaintiffs allege that the five insiders sold 1,320,990 shares of BISYS stock during the Class Period for proceeds of $60,850,834.  Defendant Mangum allegedly sold the highest volume of shares, with a total of 732,746 shares sold for proceeds of more than $37

total stock holdings each defendant sold. Nor do they respond to the Individual Defendants' claim that Sheehan and Corbin actually purchased more stock during the Class Period than they sold. Plaintiffs similarly fail to plead any facts that would suggest that defendants' sales during the Class Period deviated from their patterns of sales before and after the Class Period.

Plaintiffs' allegation that the insider sales resulted in more than $60 million in gross proceeds does not save the day. The significance of insider transactions in the *scienter* analysis is what, if anything, they suggest about the likely intent of the insiders. The gross proceeds, standing alone, tell us very little. Far more significant is the extent to which sales ahead of disclosure of negative news or purchases ahead of the disclosure of positive news lead logically to the conclusion that the insiders were aware of the news at the times of the transactions. For example, a sale of a large proportion of an insider's holdings shortly before disclosure of negative news that has a substantial downward impact on the share price suggests one thing while a sale of a small proportion of an insider's holdings comparably prior to disclosure of such news suggests something else. And while the gross proceeds may be relevant to *scienter,* they are not very probative where, as here, the complaint is essentially devoid of other factual allegations indicative of culpable knowledge or intent.

Plaintiffs, then, have not alleged facts giving rise to a strong inference of *scienter*.

---

million dollars. Sheehan was the next biggest seller, with proceeds of a little over $11 million. Dell, and Rybarczyk each sold several million dollars worth of BISYS stock, while Corbin sold only about 20,000 shares for proceeds of $812,919. Cpt. ¶ 151.

### 3) Corporate Acquisitions

Plaintiffs allege also that the Company's false and misleading financial statements allowed it to use "its inflated stock price for consideration in the acquisition of more than a dozen companies during the Class Period."[80]  As the Second Circuit has explained, "in some instances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."[81]  Acquisitions by a given corporation, however, do not give rise to an inference of *scienter* on the part of the company's executives absent allegations that the executives "engaged in the[] transactions to secure personal gain."[82]

Plaintiffs do not allege that the Individual Defendants participated in the Company's acquisitions to secure personal gain.  They draw no connection between the acquisitions and any of the personal benefits the Individual Defendants allegedly received – i.e., increased executive compensation and profits from insider trades.  Even if they had, this Court already has determined that these alleged benefits are insufficient to create an inference of *scienter*.[83]  Further, plaintiffs do not specify when during the Class Period the alleged acquisitions took place.  Accordingly, it would be impossible to determine whether any particular insider sales are linked temporally to any alleged

---

80

    *Id.* ¶ 5.

81

    *Rothman,* 220 F.3d at 93.

82

    *Rombach,* 355 F.3d at 177.

83

    *See id.* at 177 (holding that even if plaintiffs had alleged that defendants engaged in a series of acquisitions in order to increase their executive compensation, the complaint would still fail to allege the requisite motive).

acquisitions and whether those Individual Defendants who occupied executive positions for only part of the Class Period were in positions of power at BISYS when the alleged acquisitions took place.

Plaintiffs, then, fail to allege that the Individual Defendants had a motive to misrepresent the Company's true financial condition.

### b) *Conscious Misbehavior or Recklessness*

Plaintiffs allege also that the resignations of several of the Individual Defendants, the magnitude of the restatement, the fact that the accounting improprieties at BISYS violated GAAP and the Company's own internal policies, and several statements by defendant Fradin support an inference of *scienter*. The next question, then, is whether any of these alleged facts constitute strong circumstantial evidence of conscious misbehavior or recklessness.

### 1) *Allegedly Suspicious Resignations*

Plaintiffs claim that the resignations of Sheehan and Corbin "shortly before and/or coterminus with BISYS' disclosures of financial shortfalls, financial charges, improper accounting and financial restatements" support an inference of *scienter*.[84] Plaintiffs, however, have alleged no facts linking the resignation of Sheehan or Corbin to the accounting improprieties at BISYS. In reality, there are any number of reasons that an executive might resign, most of which are not related to fraud.[85] Here, documents that plaintiffs themselves cite in the Complaint suggest that Corbin resigned

---

[84] Cpt. ¶ 154.

[85] *Stambaugh v. Corrpro Cos., Inc.,* 116 Fed. Appx. 592, 598 (6th Cir. 2004) (resignations of a number of chief financial officers most likely were caused by a long period of corporate mismanagement, not by fraud); *Rosenweig v. Azurix Corp.,* 332 F.3d 854, 867 (5th Cir. 2003) (successive resignation of key officials did not create an inference of *scienter* because

to accept another opportunity and Sheehan resigned for health reasons.[86]  Plaintiffs make no attempt

to challenge these non-fraud related explanations for the resignations.  Accordingly, absent any alleged

facts linking the two resignations and the alleged fraud, the resignations of Sheehan and Corbin do not

support an inference of conscious misbehavior or recklessness.[87]

---

it was "more likely probative only of the fact that the company was failing"); *Kurtzman v. Compaq Computer Corp.,* No. Civ. A. H-99-779, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) ("[There are many reasons not related to fraud why people resign and more is needed before one *reasonably* could infer, no less before a *strong* inference arises, that the resignations were motivated by anything besides 'a sense of inadequacy for the job in the face of [the company's] troubles.").

[86] *See* Thomson StreetEvents, FinalTranscript, *BSG-BISYS GROUP INC Earnings Guidance Conference Call* (Sep. 25, 2003), *quoted in* Cpt. ¶ 78; Wachovia Securities, *BSGL CEO Resigns, New Valuation Range $12-14* (Oct. 9, 2003), *quoted in* Cpt. ¶ 80.

Although motions to dismiss are addressed to the complaint, a district court may consider also the full text of documents partially quoted or incorporated in the complaint where the documents are "integral" to it and relied upon by plaintiffs. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Rothman*, 220 F.3d at 88; *San Leandro,* 75 F.3d at 808-09.  Accordingly, this Court will consider the full text of the press release and the report quoted in the Complaint, which have been submitted in connection with defendants' moving papers, but only for the fact that the statements they contain were made, not for their truth.

[87] *Stambaugh,* 116 Fed. Appx. at 598 (affirming the district court's conclusion that resignations did not support an inference of *scienter* where plaintiffs failed to allege any connection between the resignations and the alleged fraud); *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 434 (5th Cir. 2002) (finding that resignations, without additional evidence that accounting irregularities were the reason for the resignations, do not have "any scienter implications"); *In re Interpool, Inc. Sec. Litig.,* No. Civ. 04-321 (SRC), 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) ("[T]he Third Circuit, and other courts have found resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud.") (citing *In re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig.,* 103 Fed. Appx. 465 (3d Cir.2004)); *see also Rosenweig,* 332 F.3d at 867; *Kurtzman,* 2002 WL 32442832 at *10.

The sole case that plaintiffs cite in support of their position, *In re Viviendi Universal, S.A. Securities Litigation,*[88] is not to the contrary. The *Vivendi* court did not, as plaintiffs claim, find that executive resignations supported an inference of *scienter*. Instead, the court found that massive changes in financial results reported by Vivendi's new management immediately after the old management had resigned indicated that the results reported by the old management were false.[89] It did not consider the resignations themselves – as opposed to the large changes in financial results following the resignations – to be evidence of falsity, much less of *scienter*. In fact, the court did not discuss the resignations in evaluating whether the plaintiffs had alleged *scienter*.[90]

Plaintiffs claim also that the resignation of Jose Suquet, the president of the Insurance Services Group, supports an inference of *scienter* with respect to the Individual Defendants. Plaintiffs, however, fail to allege any facts linking the resignation of Suquet to the purported fraud. Even if they had alleged such a link, it is hard to see how the resignation of an executive who has not been named as a defendant in this action could create an inference of *scienter* with respect to the seven individuals who have been named.

### 2)    *Magnitude of the Restatement*

Plaintiffs argue also that the size of the restatement alone constitutes strong evidence of *scienter*. This argument is without merit. Although several courts in this circuit have found the

---

[88]

381 F.Supp.2d 158, 176-77 (S.D.N.Y. 2003).

[89]

*Id.*

[90]

*Id.* at 184-86.

magnitude of a fraud supported plaintiffs' allegations of conscious misbehavior or recklessness, it is clear that "the size of the fraud alone does not create an inference of scienter."[91]

Even if the size of the fraud, standing alone, could create an inference of *scienter*, the fraud alleged here is not large enough to suffice. Plaintiffs here allege that BISYS' revenues were inflated by a little more than twenty percent during the Class Period. In those cases in which courts in this circuit found that the size of the fraud contributed to an inference of *scienter*, the fraud itself was significantly larger. For example, in *Chalverus v. Pegasystems, Inc.,*[92] which plaintiffs cite in support of their argument, defendants allegedly overstated a company's revenue by 158 percent. In other cases, the fraud actually bankrupted the company.[93]

### 3) Violation of GAAP and Internal Accounting Policies

Plaintiffs argue also that the fact that the financial improprieties at BISYS violated GAAP and the Company's own internal accounting policies contributes to an inference of *scienter*. This argument, too, is unavailing. To be sure, allegations of a *knowing or reckless* violation of GAAP or internal accounting policies would create an inference of *scienter*.[94] Plaintiffs, however, appear to

---

[91] *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003).

[92] 59 F.Supp.2d 226, 234 (D. Mass. 1999).

[93] *See, e.g., In re WorldCom,* 2003 WL 21488087 at *7; *In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 327 (S.D.N.Y. 2004); *In re Livent,* 78 F.Supp.2d at 199.

[94] *See, e.g., Novak,* 216 F.3d at 311 (plaintiffs adequately pleaded *scienter* where they alleged that defendants "intentionally and deliberately" refused to follow internal accounting policies); *Rothman,* 220 F.3d at 90-91 (plaintiffs adequately pleaded *scienter* where they alleged "a *reckless* failure to follow an announced policy") (emphasis added).

argue that the violations themselves, without allegations of knowledge or recklessness, indicate that the Individual Defendants acted with *scienter*.

This argument is circular. As the court explained in *In re Quintel, Inc. Securities Litigation*,[95] which plaintiffs themselves cite, "allegations of a violation of GAAP provisions, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."[96] Here, plaintiffs' allegations that the Company's financial reports violated GAAP or their own internal policies merely establish that the reports were false. They do not establish that the Individual Defendants issued those reports with the requisite fraudulent intent. Though the Company's misleading financial reports may have been caused by intentional fraud or recklessness, they could well be products of negligence or mismanagement.

### 4) Statements by Fradin

Finally, plaintiffs attempt to allege *scienter* based on BISYS chief executive officer Fradin's "admission" that he first discovered problems in BISYS' Insurance Services Group before he joined the Company.[97] They rely upon an article published by *American Banker* on June 17, 2004, which stated:

> "When Russell P. Fradin became Bisys Group Inc.'s president and chief executive in February, he knew the financial services outsourcer had some financial problems to resolve . . . Mr. Fradin said he got the first indications of trouble in the insurance

---

[95] 72 F.Supp.2d at 296 (citing *S.E.C. v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992)) (internal quotation marks omitted).

[96] *See also Chalverus*, 59 F.Supp.2d at 233 ("A defendant's failure to recognize revenue in accordance with GAAP does not, by itself, suffice to establish scienter.").

[97] Cpt. ¶ 155.

business . . . , where Bisys had made 16 acquisitions in recent years, 'when I was doing my due diligence' before joining Bisys. 'I knew about that before I joined. Maybe I didn't know the extent of it, but I haven't been surprised.'"[98]

This statement, however, does not suffice to create a strong inference of *scienter*. The fact that Fradin may have suspected that BISYS was having financial problems before he joined the Company does not establish that those problems were the result of any conscious misbehavior on the part of any of the Individual Defendants working at BISYS before Fradin came on board. Nor does it indicate that Fradin perpetuated these problems or lied about them once he joined BISYS in February 2004. In fact, in a April 22, 2004 press release – the only other statement plaintiffs attribute to Fradin – he specifically noted that the Insurance Services Group had underperformed in recent periods.[99]

*   *   *

None of these allegations, then, is sufficient to make out conscious misbehavior or recklessness. Nor do plaintiffs save their claims from dismissal by arguing that their various allegations of motive and opportunity and conscious misbehavior or recklessness – though insufficient when considered in isolation – are somehow adequate when considered together. The Second Circuit rejected this theory in *Kalnit v. Eichler,*[100] holding that a plaintiff could not allege *scienter* by combining "inadequate allegations of motive with inadequate allegations of recklessness."[101]

---

[98]
    *Id.*

[99]
    *Id.* ¶ 73.

[100]
    264 F.3d at 141.

[101]
    *See also In re Carter-Wallace, Inc. Sec. Litig.,* No. 94 Civ. 5704, 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10,1999) ("Four cubic zirconias will never add up to one real diamond and

Accordingly, plaintiffs have not alleged *scienter* with respect to any of the Individual Defendants except for Sheehan. With respect to Sheehan, plaintiffs have alleged *scienter* only as to the Company's alleged improper recognition of revenue and improper accounting for commissions payable. Plaintiffs' Section 10(b) claims against Mangum, Fox, Fradin, Rybarczyk, Corbin, and Dell therefore are dismissed in their entirety. Plaintiffs' Section 10(b) claims against Sheehan are dismissed insofar as they are based upon the Company's alleged overbooking of goodwill following acquisitions.

### 4.    PwC

The next question is whether plaintiffs have alleged *scienter* with respect to PwC. The complaint is devoid of any allegations of motive on the part of PwC.[102] Their allegations of conscious misbehavior or recklessness also are flawed.

First, plaintiffs make much of the magnitude of the fraud and the fact that BISYS' financials violated internal company policy, GAAP, and Generally Accepted Auditing Standards ("GAAS"). As discussed above, none of these is sufficient to create an inference of *scienter*.

---

neither will four generic motives add up to one or more specific motives."), *aff'd,* 220 F.3d 36 (2d Cir. 2000); *In re Keyspan Corp. Sec. Litig.,* No. 01 Civ. 5852 (ARR), 2003 WL 1702279, at *20 n.11 (S.D.N.Y. Mar. 31, 2003).

[102]

In their opposition to PwC's motion to dismiss, however, plaintiffs introduce the theory that PwC was motivated to overlook the fraud at BISYS because of PwC's desire to earn large auditing and consulting fees. Such reference to facts not alleged in the complaint is clearly improper. Accordingly, the Court will not consider this alleged motive in determining whether plaintiffs have alleged *scienter*. *See In re WorldCom, Inc. Sec. Litig.,* 382 F.Supp.2d 549, 556 (S.D.N.Y. 2005) (refusing to consider on a motion to dismiss facts that plaintiffs had alleged for the first time in their opposition to the motion, and noting that the reference to these facts was an inappropriate "de facto amendment" of the complaint).

Next, plaintiffs describe PwC's extensive access to and knowledge of BISYS, its personnel and its finances, asserting that based on these facts, PwC "should have discovered the irregularities" at BISYS.[103] These allegations do not suffice because they suggest – at most – that PwC acted negligently. Section 10(b) requires an intent to deceive, manipulate, or defraud; it does not create a cause of action for mere negligence.[104]

Finally, plaintiffs attempt to plead *scienter* by asserting that PwC ignored five "red flags" at BISYS: (1) a weakness in the Company's accounting controls, (2) the fact that BISYS managers pressured employees to make their numbers, (3) problems with the BISYS software, (4) the fact that the Company's accounting practices violated internal policy, (5) and a lack of accounting documentation. Although the Complaint discusses the red flags themselves, it does not allege that PwC knew about or disregarded these purported indications of trouble at the Company. Therefore, putting aside the question of whether these five alleged flags even signified trouble at the Company, the Complaint fails to connect them to PwC. The only exception is the alleged weakness in accounting controls at BISYS, which the Complaint alleges that PwC must have discovered during its work at the Company.[105] An allegation that PwC ignored the alleged weakness in accounting controls, however, does not translate into an inference that PwC knowingly or recklessly participated in a fraud at the

---

[103]

Cpt. ¶¶ 164-67.

[104]

*Herman & MacLean v. Huddleston,* 459 U.S. 375, 383 (U.S. 1983) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208-10 (1976) ("[A]ctions under Section 10(b) require proof of *scienter* and do not encompass negligent conduct.").

[105]

Cpt. ¶ 123.

Company.  Weak accounting controls may pave the way for fraud.  They do not themselves constitute fraud.  Accordingly, allegations regarding these five "red flags" do not suffice to create an inference of *scienter* with respect to PwC.

### IV.   Section 20(a): Control Person Liability

Plaintiffs claim that the Individual Defendants are liable as controlling persons under Section 20(a) of the Exchange Act, which provides that

> "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."[106]

To state a claim under Section 20(a) a plaintiff must allege both a primary violation and control over the primary violator.

The Individual Defendants first contend that plaintiffs must allege culpable participation by the control person.  Though courts both inside and outside the Second Circuit have disagreed on this issue,[107] this Court previously has ruled that culpable participation is not required.[108] As it explained in *In re Parmalat Securities Litigation,*[109] the lack of culpable participation is an

---

[106]

15 U.S.C. § 78t(a).

[107]

*In re NTL,* 347 F.Supp.2d at 37 n.127 (collecting cases).

[108]

*In re Parmalat Sec. Litig.,* 375 F.Supp.2d 278, 310 (S.D.N.Y. 2005); *see also In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 515-16 (S.D.N.Y. 2005); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F.Supp.2d 385, 406 (S.D.N.Y. 2005); *Neubauer v. Eva-Health USA, Inc.,* 158 F.R.D. 281, 284 (S.D.N.Y. 1994).

[109]

375 F.Supp.2d at 308-10.

affirmative defense to be pleaded and proved by defendants, not an essential element of a plaintiff's *prima facie* case.

   As discussed above, plaintiffs here have alleged a primary violation by BISYS. The only remaining question, then, is whether the Individual Defendants controlled BISYS under the meaning of Section 20(a). To plead control over a primary violator, a plaintiff must allege "that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"[110] The Individual Defendants claim that plaintiffs here have not met this requirement with respect to Dell and Rybarczyk because they make no specific allegations regarding those defendants' duties at BISYS or level of control. The Individual Defendants contend also that plaintiffs' allegations with respect to the remaining Individual Defendants are too conclusory and unparticularized to state a claim under Section 20(a).

   These arguments are without merit. Allegations of control are not averments of fraud and therefore need not be pleaded with particularity under Rule 9(b) or the PSLRA. They need satisfy only the less stringent requirements of Fed. R. Civ. P. 8.[111]

---

[110]

   *S.E.C. v. First Jersey Sec. Inc.,* 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R.§ 240.12b-2 and adopting this standard for a Section 20(a) claim), *cert. denied,* 522 U.S. 812 (1997).

[111]

   *See, e.g., In re Parmalat,* 376 F.Supp.2d at 516-17 (at the pleading stage, allegations of control are governed by Rule 8); *In re Philip Servs. Corp. Sec. Litig.,* 383 F.Supp.2d 463, 485 (S.D.N.Y. 2004); *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 415-16 (S.D.N.Y.2003) (for purposes of pleading the control element of a § 20(a) claim, "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required."); *Neubauer,* 158 F.R.D. at 284-85.

Here, plaintiffs allege that each of the Individual Defendants held a high level executive position with the Company.[112]  With the exception of Rybarczyk and Dell, each is alleged to have served as either president, chief executive officer, chief operating officer, or chief financial officer, positions that almost certainly afforded them control over the Company.[113]  Further, plaintiffs allege that several of the Individual Defendants personally signed the financial statements that contained the alleged misrepresentations.[114]  This would suffice to establish control at the pleading stage, even under *In re Atlas Air Worldwide Holdings,*[115] which the Individual Defendants cite in support of their argument that plaintiffs have not alleged control.  Finally, plaintiffs allege that each of the Individual Defendants – including Rybarczyk and Dell – "had direct and supervisory involvement in the day-to-day operations of the Company"[116] and was "involved in drafting, producing, reviewing and/or disseminating the false and misleading statements" alleged in the Complaint.[117]  Though these allegations are not particularly detailed, they do meet the requirements of Rule 8.

Accordingly, the Court will not dismiss plaintiffs' Section 20(a) claim against the Individual Defendants.

---

[112]

Cpt. ¶¶ 16-22.

[113]

*Id.*

[114]

*Id.* ¶¶ 42, 45, 59, 64, 66, 69, 72 (alleging that Sheehan signed or certified BISYS financial reports); *id.* ¶¶ 47, 57, 66 (alleging that Mangum signed BISYS financial reports); *id.* ¶¶ 47, 50, 52, 54, 57, 59, 61, 64, 66 (alleging that Corbin signed BISYS financial reports); *id.* ¶¶ 69, 72 (alleging that Fox signed BISYS financial reports).

[115]

324 F.Supp.2d at 499.

[116]

Cpt. ¶ 187.

[117]

*Id.* ¶ 26.

VII.  *Conclusion*

For the foregoing reasons, the motions of BISYS, the Individual Defendants, and PwC to dismiss the Complaint are disposed of as follows:

(a)     The motions are granted, and the Complaint is dismissed, to the extent that the Complaint:

(i)      asserts claims based on statements made or financial figures reported by defendants that do not report, relate to, or discuss financials that were later restated by BISYS;

(ii)     asserts claims against Mangum, Dell, Corbin, Fradin, Fox, or Rybarczyk under Section 10(b);

(iii)    asserts claims against Sheehan under Section 10(b) based upon the Company's alleged overbooking of goodwill following acquisitions;

(iv)    asserts claims against PwC.

(b)     The motions are denied in all other respects.

This order is without prejudice to the service and filing, on or before November 14, 2005, of an amended complaint addressing the *scienter* of the Individual Defendants and PwC.  Leave to amend is denied in all other respects.  Should plaintiffs amend, they shall serve and provide the Court with red- or black-lined copies of the amended pleading.

SO ORDERED.

Dated:  October 28, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)