**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **IN RE BISYS SECURITIES LITIGATION** | **Civil Action No.**<br>**04-CV-3840 (JSR) (ECF Case)** |

---

## MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION OF LEAD PLAINTIFFS' COUNSEL FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

CAULEY BOWMAN CARNEY
& WILLIAMS, PLLC
S. Gene Cauley, Esq. (admitted *pro hac vice*)
J. Allen Carney, Esq. (admitted *pro hac vice*)
Marcus Bozeman, Esq.
Tiffany Wyatt Oldham, Esq.
P.O. Box 25438
Little Rock, Arkansas 72221
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Co-Lead Counsel and Coordinating Counsel*

KIRBY McINERNEY & SQUIRE, LLP
Jeffrey H. Squire, Esq. (JS-8910)
Peter S. Linden, Esq.(PL-8945)
Ira M. Press, Esq. (IP-5313)
Pamela E. Kulsrud, Esq. (PK-4310)
830 Third Avenue, 10th Floor
New York, New York 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Co-Lead Counsel*

January 11, 2007

## TABLE OF CONTENTS

I.    SUMMARY OF THE ARGUMENT .......................................... 1

II.   PRELIMINARY STATEMENT ............................................. 3

III.  THE FEE REQUESTED IS APPROPRIATE GIVEN THE RISKS
      AND RESULTS OF THIS LITIGATION ................................... 3

      A.    A Reasonable Percentage of the Fund Recovered Is An
            Appropriate Basis on Which To Award Attorneys' Fees
            In This Common Fund Case ................................... 3

      B.    The Standard for Approval In the Second Circuit ........................ 4

      C.    Each of The Factors Established By The Second Circuit
            Supports the Requested Attorneys' Fee In This Litigation .................. 6

            1.    Time and Labor Expended by Counsel .......................... 7

            2.    The Complexity, Difficulty And Risks Attendant To The
                  Litigation Supports Approval Of The Requested Fee ................ 9

            3.    The Ricks of Either A Small Recovery, Or No Recovery, As
                  Well As Counsels' Contingent Fee Risk, Support Award
                  Of The Requested Fees ....................................... 13

            4.    The Quality of Representation ................................. 14

            5.    The Requested Fee In Relation To The Settlement ................. 16

            6.    Public Policy Considerations .................................. 19

            7.    A "Cross-Check" of Lodestar Confirms That The
                  Requested Fee Is Reasonable ................................. 22

IV.   CLASS MEMBERS' REACTION TO THE REQUESTED FEE .................. 23

V.    LEAD COUNSEL, LEAD PLAINTIFF AND THE CLASS
      REPRESENTATIVE ARE ENTITLED TO BE REIMBURSED
      FOR THEIR REASONABLE LITIGATION EXPENSES ...................... 23

VI.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page No.**

*Adair v. Bristol Tech Syst.*, 97 Civ. 5874, 1999 U.S. Dist. LEXIS 17627,
    (S.D.N.Y. Nov. 16, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Allapattah Services, Inc. v. Exxon Corp.*,
    No. 91-0986-CIV-GOLD, 2006 WL 2423784 (S.D. Fla. July 6, 2006) . . . . . . . . . . . . 17

*Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,
    No. 96-0683 (DAB), 2002 U.S. Dist. LEXIS 10732 (S.D.N.Y. June 17, 2002) . . . . . 5, 18

*Bateman Eichler, Hill Richards, Inc., v. Berner*,
    472 U.S. 299 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Becher v. Long Island Lighting Co.*,
    64 F. Supp. 2d 174 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Blum v. Stenson*,
    465 U.S. 886 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Camden I Condominium Association v. Dunkle*,
    946 F.2d 768 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cimarron Pipeline Constr., Inc. v. National Council on Comp. Ins.*,
    Nos. 89-822-T & Civ-1186-T, 1993 U.S. Dist. LEXIS 19969,
    (W.D. Okl. June 8, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cullen v. Whitman Med. Corp.*,
    197 F.R.D. 136 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dura Pharms. Inc. v. Broudo*,
    544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gaskill v. Gordon*,
    942 F. Supp. 382 (N.D. Ill. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Greene v. Emersons Ltd.,*
No. 76 Civ. 2178 (CSH), 1987 U.S. Dist. LEXIS 3980(S.D.N.Y. May 20, 1987) . . . . . 19

*Goldberger v. Integrated Res.,*
209 F.3d 43 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 21

*Harman v. Lyphomed, Inc.,*
945 F.2d 969 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

*Hicks v. Morgan Stanley & Co., et al.,*
01 Civ. 10071 (KJH), 2005 U.S. Dist. LEXIS 24890,
(S.D.N.Y. October 24, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 21

*In re Aetna Inc. Sec. Litig.,*
MDL No. 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) . . . . . . . . . . . . . 9, 13

*In re Agent Orange Prod. Liab. Litigation,*
611 F. Supp. 1296 (E.D.N.Y. 1985)
*aff'd in relevant part,* 818 F.2d 226 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re American Bank Note Holographics,*
127 F. Supp. 2d 418 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,*
MDL Docket No. 1500, 02 Civ. 5575,
2006 U.S. Dist. LEXIS 78101 (S.D.N.Y. Sept. 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Blech Sec. Litig.,* No. 94 Civ. 7696 (RWS),
2002 U.S. Dist. LEXIS 23170 (S.D.N.Y. Dec. 4, 2002) . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Buspirone Antitrust Litigation,*
No. MDL 1413, 01-CV-7951,
2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 17, 2003) . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Combustion, Inc.,*
968 F. Supp. 1116 (W.D. La.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Continental Ill. Secs. Litig.,*
962 F.2d 566 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Crazy Eddie Sec. Litig.* ,
    824 F. Supp. 320 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9, 14, 23

*In re Greenwich Pharm. Sec. Litig.*,
    No. 92-3071, 1995 U.S. Dist. LEXIS 5717 (E.D. Pa. Apr. 27, 1995) . . . . . . . . . . . . . . 19

*In re Home-Stake Prod. Co. Sec. Litig*,
    MDL No. 153 (N.D. Okl. Jan. 2, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Ikon Office Solutions, Inc.*,
    194 F.R.D. 166 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In Re Informix Corp. Sec. Litig.*,
    No. 97-1289 (N.D. Cal Nov. 23, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Linerboard Antitrust Litigation*,
    MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) . . . . . . . . . . . . . . . . . . . . . 17

*In re Lloyd's American Trust Fund Litigation*,
    No. 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) . . . . . . . . . . . . . . . . . 5

*In re Medical X-Ray Film Antitrust Litig.*,
    No. 93 CV 5904, 1998 U.S. Dist. LEXIS 14888(E.D.N.Y. Aug. 7, 1998) . . . . . . . . . . . 18

*In re Merry-Go-Round Enterprises, Inc.*,
    244 B.R. 327 (Bankr. D. Md. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 23

*In re Prudential Bache Energy Income P'ships Sec. Litig.*,
    MDL No. 888, 1994 U.S. Dist. LEXIS 6621(E.D. La. May 18, 1994) . . . . . . . . . . . . . . 19

*In re Public Serv. Co.*, No. 91-0536M,
    1992 U.S. Dist. LEXIS 16326 (S.D. Cal. July 28, 1992) . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23

*In re Safety Components Int'l Inc.*,
    166 F. Supp. 2d 72 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*In Re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*,
    268 F. Supp. 2d 907 (N.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Sumitomo Copper Litig.*,
    74 F. Supp. 2d 393 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19

*In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Union Carbide Corp. Consumer Prod. Business Sec. Litig.*,
    724 F. Supp. 160 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . 4, 5, 9, 16, 21, 22, 25

*In re Vitamins Antitrust Litigation*,
    No. MISC. 99-197(TFH), MDL 1285,
    2001 WL 34312839 (D. D.C. July 16, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re The Warnaco Group, Inc. Sec. Litig.*,
    00-CV-6266 (Feb. 4, 2004)(McKenna, J) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18

*In re Warner Communs. Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18, 21

*In re WorldCom, Inc. ERISA Litig.*,
    No. 02 Civ. 4816, 2005 WL 3116188(S.D.N.Y. Nov. 22, 2005) . . . . . . . . . . . . . . . . . . 6

*In re Worldcom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 19

*In re Worldcom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 8525,
    at *9 (S.D.N.Y. May 22, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Kurzweil v. Philip Morris Co.*,
    94 Civ. 2373 (MBM) & 94 Civ. 2546 (MBM),

1999 U.S. Dist. LEXIS 18378 (S.D.N.Y. 1999) .............................. 16

*Liles v. Del Campo,*
350 F.3d 742 (8th Cir. 2003) ............................................. 14

*Maley v. Del Global Techs. Corp.,*
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................... 6, 12, 15, 21, 25

*Matter of Continental Illinois Securities Litigation,*
962 F.2d 566 (7th Cir. 1992) ............................................. 22

*Maywalt v. Parker & Parsley Petroleum Co.,*
963 F. Supp. 310 (S.D.N.Y. 1997) ........................................ 19

*Meijer, Inc. v. 3M,*
Civil Action No. 04-5871, 2006 U.S. Dist. LEXIS 56744
(E.D. Pa. Aug. 15, 2006) .................................................. 9

*Miltland Raleigh-Durham v. Myers,*
840 F. Supp. 235 (S.D.N.Y. 1993) ....................................... 25

*New York State Association for Retarded Children, Inc. v. Carey,*
711 F.2d 1136 (2d Cir.1983) ............................................. 22

*Olick v. Parker & Parsley Petroleum Co.,*
145 F.3d 513 (2d Cir. 1998) ............................................. 19

*Phemister v. Harcourt Brace Jovanovich, Inc.,*
No. 77 C 39, 1984 U.S. Dist. LEXIS 23595 (N.D. Ill. Sept. 14, 1984) ............. 19

*Ressler v. Jacobson,*
149 F.R.D. 651 (M.D. Fla. 1992) ......................................... 21

*Savoie v. Merchants Bank,*
166 F.3d 456 (2d Cir. 1999) .............................................. 4

*Sheppard v. Consolidated Edison Co.,*
No. 94 CV 0403 (JG), 2002 U.S. Dist. LEXIS 16314 (E.D.N.Y. Aug. 1, 2002) ...... 5

*Silverberg v. People's Bank,* No. 00-9548, 2001 U.S. App. LEXIS 22859,
(2d Cir. Oct. 16, 2001) .................................................. 18

*Skelton v. General Motors Corp.*,
    860 F.2d 250 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*,
    Civil Action No. 03-4578, 2005 U.S. Dist. LEXIS 9705,
    (E.D. Pa. May 20, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Trief v. Dun & Bradstreet Corp.*,
    840 F. Supp. 277 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 9

**Other Authorities**                                                          **Page No.**

15 U.S.C. § 78u-4(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Federal Judicial Center (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Denise M. Martin, Vinita M. Juneja, Todd S. Foster, Frederick C. Dunbar,
    *Recent Trends IV: What Explains Filings and Settlements in*
    *Shareholder Class Actions?* (NERA 1996) (examining 66 securities
    class actions that were settled, dismissed or resolved by jury verdict
    between January 1991 and December 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Law and Economics Consulting Center (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

National Economic Research Associates (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

National Economic Research Associates (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr.,
    *Attorney Fee Awards in Common Fund Class Actions*,
    24 Class Action Rep. 169 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees in Class Action Settlements:*
    *An Empirical Study*, 1 J. EMPIRICAL LEGAL STUDIES, 27, 51 (2004) . . . . . . . . . . . . . . . 18

Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts:*
    *Final Report to the Advisory Committee on Civil Rules* (1996)
    (examining all class settlements in 4 federal district courts between
    mid-1992 and mid-1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Todd S. Foster, Denise M. Martin, Vinita M. Juneja, Frederick C. Dunbar,
    *Trends in Securities Litigation and the Impact of the*
    *PSLRA* (NERA 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Vincent E. O'Brien, *A Study of Securities Class Action Fraud Cases,*
    1988-1996 (Law & Economics Consulting Center) (examining 1,280
    securities class actions from April 1988 through September 1996) . . . . . . . . . . . . . . . 17

Plaintiffs' Co-Lead Counsel in this complex securities class action, Cauley, Bowman, Carney and Williams, PLLC, and Kirby McInerney & Squire, LLP (collectively, "Lead Counsel"), have succeeded in obtaining a fully funded, invested and interest bearing $65,875,000 cash settlement (the "Settlement") for the benefit of the Class.[1]  Moreover, that amount resides in interest bearing accounts pending disbursement, and it will therefore increase by the time of distribution (the Settlement, augmented by capitalized interest, is referred to as the "Settlement Fund").  This is an exceptional result, and a credit to Lead Counsel's vigorous, persistent and creative efforts.  Indeed, the recovery returns to shareholders approximately 33% of their per-share damages - a result far outstripping typical securities class action recoveries which average 5.5% - 6.23% of estimated losses. *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa 2001).  Accordingly, Lead Counsel respectfully submit this brief in support of their joint application for an award of attorneys' fees in the amount of 30% of the $65,875,000 Settlement memorialized in the Stipulation and Agreement of Settlement executed October 30, 2006 (the "Stipulation").  In addition, Lead Counsel request reimbursement of their out-of-pocket expenses incurred in prosecuting the litigation in the amount of $798,880.33.

## I.    SUMMARY OF THE ARGUMENT

Lead Counsel seek an award of fees in the amount of 30% of the Settlement amount of $65,875,000, plus interest.  This request is reasonable and fair for a variety of reasons.  To begin with, the award of a fee as a percentage of the fund recovered should be encouraged because it motivates counsel to obtain the maximum recovery.  Second, the percentage requested here is in the

---

[1]All capitalized terms not defined herein have the same meanings as set forth in the Stipulation and Agreement of Settlement dated October 30, 2006.

-1-

range of comparable percentages awarded in other cases, even when a large recovery has been obtained. Third, the requested fee is appropriate given the size of the benefit conferred on members of the Class. Fourth, the requested award provides a proper incentive to bring and effectively prosecute class actions and promote the private enforcement of the federal securities laws. Fifth, the litigation was prosecuted entirely on a contingent basis and Lead Counsel's investment in time and money was substantial and always at risk of non-payment unless a result was obtained for the Class. Sixth, the requested fee represents an appropriate multiplier of counsel's lodestar given the high risk and complex nature of the litigation and the result obtained. Seventh, the litigation presented complexities with a substantial risk of non-recovery. Eighth, both sides to the litigation were represented by counsel of the highest caliber. Ninth, the members of the Class have reacted in overwhelmingly positive fashion to the Settlement in this case, providing further support for the award requested here. Finally, expenses should be fully reimbursed as they were reasonably and necessarily incurred in the prosecution of this litigation and culminated in the Settlement.

As more fully described in this Memorandum and in the accompanying Joint Declaration of S. Gene Cauley and Jeffrey H. Squire (the "Joint Declaration"), the Settlement was reached only after, among other things: (i) an extensive pre-filing investigation, including the review and analysis of public disclosures such as relevant SEC filings, press releases, analyst reports, and other publicly available information; (ii) interviews with former employees of The BISYS Group ("BISYS" or the "Company"); (iii) the research and drafting of a consolidated complaint; (iv) preparation of papers opposing the various Defendants' separate motions to dismiss the consolidated complaint; (viii) more than two years of hard-fought, contentious litigation; (ix) engaging in extensive, formal, and informal discovery; (x) the review of millions of pages of documents produced by Defendants and

third parties containing thousands of accounting and spreadsheet reports, which required special

professional attention; (xi) retention of and consultations with accounting and damage experts to

evaluate and opine upon the class' claims for accounting irregularities, insider trading and damages

in the litigation; (xii) depositions of Company employees and third party witnesses and the issuance

of additional deposition subpoenas; and (xiii) extensive and protracted arms-length negotiations with

counsel for the Defendants, which were conducted under the guidance of the Hon. Nicolas Politan.[2]

## II.    PRELIMINARY STATEMENT AND SUMMARY OF FACTS

For purposes of brevity, this Memorandum incorporates by reference the description of the

facts and procedural history of this action as set forth in the Joint Declaration of S. Gene Cauley and

Jeffrey H. Squire, filed concurrently herewith.

## III.    THE FEE REQUESTED IS APPROPRIATE GIVEN THE RISKS AND RESULTS OF THIS LITIGATION

### A.    Reasonable Percentage Of The Fund Recovered Is An Appropriate Basis On Which To Award Attorneys' Fees In This Common Fund Case

It has long been recognized that a person who maintains a suit culminating in the creation

of a benefit in which others have a common interest may obtain fees from that common benefit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer who recovers a

---

[2]As required under the Preliminary Approval Order, on November 22, 2006, the Notice was mailed to approximately 59,955 potential Class members or their nominees, see the accompanying Affidavit of Anya Verkovskaya. The Notice contained the terms of the Settlement; the Plan of Allocation for distributing the Settlement proceeds among Class members; a statement that attorneys' fees of up to one-third of the Settlement and reimbursement of expenses would be sought; the method for objecting to the Settlement or attorneys' fees or costs sought; and the December 28, 2006 deadline for the filing and service of such objections. Similarly, the Summary Notice was published in the national editions of *The Wall Street Journal* and *Investor's Business Daily* on November 17, 2006. Verkovskaya Aff. Exs. 4 and 5.

common fund for the benefit of persons other than himself or his client is entitled to a reasonable

attorney's fee from the fund as a whole."). This school of thought, which has come to be known as

the "common fund doctrine," is designed to prevent the unjust enrichment of class members who

would otherwise profit from a lawsuit without paying for it. *See Boeing*, 444 U.S. at 478. This

"percentage approach," which authorizes awards of attorneys' fees consisting of some portion of a

common fund, serves the dual purposes of inducing representatives to seek redress for damages

caused to an entire class of persons, as well as discouraging future misconduct.

**B.    The Standard For Approval In The Second Circuit**

The trend in the Second Circuit is toward the percentage approach rather than the

"cumbersome, enervating, and often surrealistic process" of evaluating fee petitions under the

competing lodestar/multiplier approach. *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.

Supp. 2d 503, 520 (E.D.N.Y. 2003); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436,

466 (S.D.N.Y. 2004); *see also In re The Warnaco Group, Inc. Sec. Litig.*, 00-CV-6266 (Feb. 4,

2004)(McKenna, J) ("I am glad to see people following percentages rather than lodestars."), Slip.

Op. at p. 3.[3]  Among the advantages of the percentage method is that it erases lawyers' temptation

to "run up the number of billable hours" for which they would be compensated by the lodestar

method, *Savoie v. Merchants Bank*, 166 F.3d 456, 460-61 (2d Cir. 1999), and permits a judge "to

focus on 'a showing that the fund conferring a benefit on the class resulted from the lawyers' efforts,'

rather than [on] collateral disputes over billing." *In re NASDAQ Market-Makers Antitrust Litig.*, 187

---

[3]The Supreme Court has likewise recognized the propriety of the percentage of recovery approach as an appropriate methodology for awarding Lead Counsel 's fees in a common fund case. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class.").

F.R.D. 465, 485 (S.D.N.Y. 1998) (quoting *Camden I Condominium Association v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)).[4]

When it expressly approved the percentage approach, the Second Circuit reasoned that the lodestar method, which focuses on the reported billable hours actually submitted by the attorneys who collected a fund, is difficult to apply and wastes judicial resources. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). By contrast, the percentage system "aligns the class members' and class counsel's interest, and it additionally 'provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *In re Global Crossing*, 225 F.R.D. at 446 (quoting *In re Lloyd's*, No. 95 Civ. 1262, 2002 WL 31663577, at *25). The percentage method also mirrors fee arrangements between private litigants and their attorneys in the marketplace. *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999).

The Second Circuit has not completely discarded the lodestar analysis, however, as the appellate tribunal encourages use of that framework as a 'cross-check' on the reasonableness of the requested percentage. *Wal-Mart Stores*, 396 F.2d at 123.[5] Thankfully, though, hours documented by counsel need not be thoroughly scrutinized, *see id.* at 121, allowing district courts to sidestep a process that Judge McLaughlin in *Goldberger* likened to "resurrect[ing] the ghost of Ebenezer

---

[4]*See also In re Visa*, 297 F. Supp. 2d at 520 (trend in this Circuit is to award attorneys' fees using percentage method); *Sheppard v. Consolidated Edison Co.*, No. 94 CV 0403 (JG), 2002 U.S. Dist. LEXIS 16314, at * 23 (E.D.N.Y. Aug. 1, 2002) (same); *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, No. 96-0683 (DAB), 2002 U.S. Dist. LEXIS 10732, at *3 (S.D.N.Y. June 17, 2002); *cf. In re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307-08 (1st Cir. 1995) (noting several advantages of the percentage of fund approach and concluding that the "use of the POF method in common fund cases is the prevailing praxis").

[5]*See also, e.g., In re NASDAQ*, 187 F.R.D. at 489 (collecting cases); *In re Visa*, 297 F. Supp. 2d at 524 n.33 (collecting cases).

Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits."

*Wal-Mart Stores,* 396 F.3d at 121 (internal quotations and citations omitted); *see also In re*

*WorldCom, Inc. ERISA Litig.*, No. 02 Civ. 4816, 2005 WL 3116188, at *7 (S.D.N.Y. Nov. 22, 2005)

(Cote, J.). This more general review of time submitted by attorneys pays proper homage to the

Supreme Court's admonition that a "request for attorney's fees should not result in a second major

litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

Just as significantly, the PSLRA, which applies to securities class actions such as this, states

that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall

not exceed a *reasonable percentage* of the amount" recovered for the Class. 15 U.S.C. § 78u-4(a)(6)

(emphasis added). Courts have concluded that, by drafting the operative statute in this manner,

Congress expressed a preference for the percentage method as opposed to the lodestar method for

determining attorneys' fees in securities class actions. *See Maley v. Del Global Techs. Corp.,* 186

F. Supp. 2d 358, 370 (S.D.N.Y. 2002); *In re American Bank Note Holographics*, 127 F. Supp. 2d

418, 430 (S.D.N.Y. 2001). Given this legal landscape, Lead Counsel asks the Court to award

attorneys' fees by utilizing the percentage methodology.

### C.   Each Of The Factors Established By The Second Circuit Supports The Requested Attorneys' Fee In This Litigation

Second Circuit jurisprudence has established six factors a reviewing court should consider

in evaluating what constitutes a reasonable fee:

>          (1) the time and labor expended by counsel;
>
>          (2) the magnitude and complexities of the litigation;
>
>          (3) the risk of the litigation;

(4) the quality of representation;

(5) the requested fee in relation to the settlement; and

(6) public policy considerations.

*Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger v. Integrated Res.*, 209 F.3d 43, 50 (2d Cir. 2000)).

As revealed in the succeeding subsections of this Memorandum, application of these criteria to the facts of this matter shows that the instant fee request is clearly warranted under existing law.

### 1.    Time And Labor Expended By Counsel

As detailed in the Joint Declaration and its Appendices, Lead Counsel in prosecuting this Litigation over the course of more than two (2) years expended thousands upon thousands of hours resulting in a lodestar of more than $6 million. The Joint Declaration establishes that the prosecution of this action included, among other things:

- Investigating the circumstances surrounding the Company's restatement announcement, including interviews of former Company employees;

- Researching and drafting the operative 94-page Complaint;

- Litigating a complicated array of motions to dismiss, which challenged all aspects of the Complaint;

- Mastering the information, data and documents through the creation of an electronic data base;

- Consulting with the Class's experts with respect to accounting, damages and liability issues;

- Reviewing, analyzing and mastering both the PWC audit workpapers and more than 2.0 million pages of documents produced by Defendants and third-parties;

- Conducting numerous depositions of parties, Company employees, and third

parties;

- Engaging in multiple rounds of adversarial settlement discussions, including several mediation sessions with The Honorable Nicolas H. Politan.

The efforts undertaken by Lead Counsel were, to say the least, extensive. Measured by any benchmark, Lead Counsel's activities in connection with these proceedings unquestionably demonstrate a vast and energetic commitment. As discussed in this Memorandum and in the Joint Declaration, Lead Counsel has a well founded belief that this commitment and these activities were responsible for the superior result achieved here for the Class.

The requested fee in this case not only represents a reasonable percentage of the benefit obtained, but reasonably reflects the work accomplished by the attorneys. The Settlement confers a substantial and immediate benefit to the Class, resolving this complex litigation: less than 3 years after the filing of the initial complaint; after substantial and complex motion practice; after massive document discovery and depositions; and after both extensive third-party discovery and the retention of multiple liability and damages experts. The fee is further justified because counsel on both sides of the bar in this case are of the highest caliber, and everything done by Lead Counsel was fully contingent and carried a genuine risk of non-recovery. Perhaps most importantly, the recovery here is approximately 33% of Plaintiffs' estimate of damages (and 165% of defendants' damage estimate). Relying upon the lodestar methodology as a gauge of reasonableness, a comparison of counsels' hours to the percentage fee requested yields a "multiplier" of 2.99, which is well within the range granted by courts in this district, as well as other districts, in similarly complex litigations. *See, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,* MDL Docket No. 1500, 02 Civ. 5575, 2006 U.S. Dist. LEXIS 78101, at *82-83 (S.D.N.Y. Sept. 28, 2006) (approving a 3.69 multiplier);

*Meijer, Inc. v. 3M,* Civil Action No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *80 (E.D. Pa. Aug. 15, 2006) ("[T]he requested lodestar of 4.77 is acceptable and does not call for a reduction in Plaintiffs' Counsel requested attorneys' fees award."); *In re Worldcom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (4.0 multiplier); *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.,* Civil Action No. 03-4578, 2005 U.S. Dist. LEXIS 9705, at*60 (E.D. Pa. May 20, 2005) (15.6 muliplier); *Wal-Mart Stores,* 396 F.3d 123 ("[T]he lodestar yields a multiplier of 3.5, which has been deemed reasonable."); *In re Visa,* 297 F. Supp. 2d at 524 ("The lodestar cross-check, which results in a multiplier of 3.5, further convinces me that my award is reasonable."); *In re Nasdaq,* 187 F.R.D. at 489 (approving multiplier of 3.97 and noting that "in recent years multipliers of between 3 and 4.5 have become common"); *In re Aetna Inc. Sec. Litig.,* MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *49-50 (E.D. Pa. Jan. 4, 2001) (multiplier of 3.6).

The magnitude and complexity of the litigation is indisputable, as are the time and effort invested by Lead Counsel to obtain this Settlement. The results obtained can likewise be characterized as superlative. Lead Counsel's request is reasonable both under a percentage of fund and lodestar analysis.

      **2.     The Complexity, Difficulty And Risks Attendant To The Litigation Supports Approval Of The Requested Fees[6]**

The Second Circuit "has identified the risk of success as 'perhaps the foremost' factor to be considered in determining" reasonable attorneys' fees. *In re Global Crossing,* 225 F.R.D. at 467. Using this polestar to guide the way, it bears emphasis that Lead Counsel has completely financed this costly litigation while remaining uncompensated for nearly three years. Investment of these

---

[6] Due to the close analytical relationship between the second and third factors set forth in *Goldberger,* those two factors are analyzed together.

resources limited each firm's ability to staff other matters and to accept new profit-generating opportunities. Risks and consequences like these weigh in favor of higher compensation. This is especially so when, in the face of these risks, Lead Counsel held out for a substantial settlement that reflected their estimates of the inherent value of the matter.

Turning directly to the claims at issue here, Plaintiffs alleged that, as a result of the fraudulent misstatements and omissions, BISYS's stock declined, thereby injuring Plaintiffs and the Class. To succeed on these claims, it was incumbent upon the Class to show that, in connection with the sale of BISYS securities, Defendants, acting with *scienter,* made at least one false material misrepresentation or omitted to disclose material information, and that Plaintiffs' reliance on BISYS's action caused their injury. *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95-6 (2d Cir. 2001). As an initial matter, the difficulty in proving that complex and arcane accounting rules were violated cannot be overstated. Moreover, the always difficult burden of demonstrating *scienter* was only one of a host of potential pitfalls in front of Plaintiffs had the case proceeded, as the action also presented complex issues in establishing proportional liability, causation, and damages. Each of these elements was hotly contested by Defendants, and it clearly would have required an extensive amount of time to prosecute these and other matters though trial, with the constant risk of Lead Plaintiffs being unable to successfully prove any one of these points.

To summarize just some of the arguments Plaintiffs would have found it necessary to overcome to prevail at trial, Defendants would surely have continued to press their contention that the restatement of more than three years of financial statements represented an unexpected and unpredictable shift by the Company's auditors. Defendants claimed there was a legitimate change in estimates that its external auditors, PWC, suddenly and without warning insisted warranted a

restatement - and could not have been known at the time the original financial statements were filed. To reiterate, then, Plaintiffs confronted a significant risk in terms of proving Defendants' scienter.

As a consequence, the jury at any trial of this lawsuit would have been required to make findings on sophisticated matters such as the exact time when Defendants knew their accounting system failed to properly recognize (and reconcile) commissions receivable reported by its insurance division; how to weigh Defendants' efforts (in early 2001) to revamp the Company's accounting system to incorporate the frequent acquisitions of smaller insurance agencies - which had routinely and appropriately conducted their accounting on a cash basis - and the conversion of those agencies' financial figures to an accrual basis; as well as the extent to which Defendants were entitled to rely on their professional auditors. Defendants have repeatedly argued, and this Court has agreed, that the mere existence of a financial restatement does not in itself prove fraud and that Defendants could not have predicted that its auditors, who had repeatedly approved the financial statements of BISYS, would be suddenly overcome with a change of heart regarding the Company's revenue recognition policies. At the end of the day, then, the jury would have been called upon to sift through complex and contradictory - not to mention mind numbing - documentary evidence and witness testimony.[7]

With respect to loss causation, Plaintiffs bore the very substantial risk that in the aftermath of *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336 (2005), they would not be able to satisfactorily link the declines in BISYS stock prices with the misrepresentations that form the basis of Plaintiffs' claims. Specifically, Plaintiffs' discovery revealed that certain of the significant price drops that occurred during the Class Period were arguably caused by things other than the accounting

---

[7]Along these same lines, and in light of the Company's second substantial restatement during the Class Period, Plaintiffs were sure to encounter similar hurdles when attempting to demonstrate Defendants' liability for damages caused by the new restatement.

misrepresentations on which the restatements were based. The price reactions in response to the Company's announcements of the actual restatements were less dramatic. That being so, a portion of the Class's losses could not easily be attributed to Defendants' misconduct.[8]

Reflecting upon similar causes of action in another securities case, this Court has previously recognized that "It is beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members." *Strougo v. Bassini,* 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (quoting *Trief v. Dun & Bradstreet Corp.,* 840 F. Supp. 277, 282 (S.D.N.Y. 1993)); *see also Maley*, 186 F. Supp. 2d at 372 ("A securities case such as this one, 'by its very nature, is a complex animal . . . .'"). These sentiments apply with equal force here. Ultimately, this case would have devolved into a "battle of experts" -- a battle in which no party is ever assured to prevail. The Court, and then eventually the jury, would have had to determine whether Plaintiffs' or Defendants' model was more accurate. The underlying  process of retaining experts, preparing experts, obtaining and exchanging reports, taking depositions and presenting expert testimony at trial is perhaps the most expensive, time-consuming and burdensome aspect of this kind of litigation. In sum, the complexity of this litigation translates into considerable and material risk that Plaintiffs would not secure a recovery that would be greater than the amount of money recovered for the Class through the Settlement.

---

[8]For additional confirmation that the case carried substantial risk, one need look no further than Judge Kaplan's order regarding the motions to dismiss, which makes plain that absent the damning statements from former employees obtained during Lead Counsel's investigation, the matter would have been dismissed in its entirety. On this score, it is notable that Judge Kaplan rejected out of hand any notion that the large restatement and GAAP violations provided any evidence of *scienter*.

**3.    The Risks Of Either A Smaller Recovery, Or No Recovery, As Well As Counsels' Contingent Fee Risk, Support Award Of The Requested Fees**

The complexities described above, in conjunction with the other circumstances of the case, present a significant risk that Lead Counsel could continue to prosecute this case for several more years (through completion of discovery, expert discovery, summary judgment proceedings, trial and the inevitable appeals that would follow) and, at the end of the day, recover less than the proposed Settlement, or nothing, for the Class.[9] *See In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (noting that where large sums are at issue, litigation is guaranteed to be long and drawn-out, and that any verdict for the plaintiff would be appealed by defendants, further extending litigation); *accord In re Aetna*, 2001 U.S. Dist. LEXIS 68, at *22 ("The risk of delay could have deleterious effects on any future recovery . . . ."). Beyond the very real possibility of an ultimate recovery of zero, there lies another valid risk factor in this and every case; namely that a portion of potential settlement funds are being drained pursuant to "wasting" insurance policies – policies that are being depleted by defense costs as the litigation continues. Courts consider the potential negative impact of the depletion of these policies on class recovery. *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 U.S. Dist. LEXIS 8525, at *9 (S.D.N.Y. May 22, 2003) (noting that expenditures on defense costs deplete "wasting" insurance policies and diminish available recovery for class members); *Liles v. Del Campo*, 350 F.3d 742, 745 (8th Cir. 2003) (citing existence of "wasting" insurance policies as factor favoring preliminary approval and enjoining related litigation

---

[9]In assessing the risks undertaken by Lead Counsel, the Court should not view those risks from the perspective that a multi-million dollar settlement was ultimately reached. Rather, the Court must assess the risks Lead Counsel faced at the *outset* of the litigation. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (contingent multiplier "is designed to reflect the riskiness of the case at the outset"); *Skelton v. General Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988) (same).

from going forward); *In Re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 933 (N.D. Ohio 2003) (recognizing advantage of halting depletion of "wasting" insurance policies); *In re Safety Components Int'l Inc.*, 166 F. Supp. 2d 72, 88 (D.N.J. 2001) (additional discovery would have diminished funds available for recovery). As a result, Plaintiffs faced a substantial risk that even if it proved liability and damages, it would be unable to recover any judgment, let alone a substantial sum as presented by this Settlement.

### 4.    The Quality Of Representation

Honing in on the particular aptitude of counsel, this factor is designed to reward "particularly resourceful legal work that secures a substantial benefit." *In re Agent Orange Prod. Liab. Litigation*, 611 F. Supp. 1296, 1313 (E.D.N.Y. 1985), *aff'd in relevant part*, 818 F.2d 226 (2d Cir. 1987). As part of this analysis, courts consider, among other things, the recovery obtained and the backgrounds of the lawyers involved. *See In re Global Crossing*, 225 F.R.D. at 467; *Maley*, 186 F. Supp. 2d at 373. The quality of the representation is best measured by the results achieved. *Wal-Mart Stores*, 396 F.3d at 117.

Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. Such experience in the field allowed Lead Counsel to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them. Lead Counsel's reputations as attorneys who zealously carry a meritorious case through the trial and appellate levels as well as Lead Counsel's demonstrated ability to vigorously develop the evidence in this case placed Plaintiffs in a strong position during settlement negotiations with the Settling

Defendants.[10]

The quality of opposing counsel is also significant in considering the quality of services rendered by Plaintiffs' counsel, as measured by the result achieved. *In re WorldCom*, 388 F. Supp. 2d at 358 ("The ability of Class Counsel to obtain record-breaking settlements in the face of a stubborn and well executed defense further evidences the excellent quality of petitioners' work."); *Maley*, 186 F. Supp. 2d at 373 ("The quality of opposing counsel is also important in evaluating the quality of the services rendered by Plaintiffs' Class Counsel"). Settling Defendants here were represented by Skadden, Arps, Slate, Meagher & Flom LLP; Cahill Gordon & Reindel, LLP and Jenner & Block LLP. Among the most respected legal establishments in the country, each firm has hundreds of attorneys in its litigation department alone. Throughout the Litigation, Settling Defendants' counsel unfailingly identified the weakest components of Plaintiff's case. Furthermore, in litigating against the Settling Defendants, Lead Counsel faced adversaries with no meaningful limits on the resources they could mount to defend.

Equal to this daunting challenge, Lead Counsel themselves have national standing and are among the most experienced securities lawyers in the country. Few lawyers would have had the experience, professionalism and knowledge to develop a successful litigation plan, and negotiate a substantial settlement in a case such as this. *See In re Warner Communs. Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985) (high standing and extensive experience of Lead Counsel also relevant in determining whether multiplier to lodestar fee should be awarded). The skill of Lead Counsel can best be measured by the results achieved for the benefit of the Class. *See In re Visa,* 297 F.

---

[10]To be frank, it was only through the exercise of legal creativity, tenacity and sheer effort that Lead Counsel was able to obtain a recovery representing approximately 33% of realistically provable damages possible for the Class – many times what studies show to be standard.

Supp. 2d at 524 ("The quality of representation is best measured by results.") (citation omitted).

Here, Lead Counsel have created an excellent benefit in the form of a $65,875,000 Settlement Fund

in this Settlement with BISYS and the Individual Defendants. The result achieved by Lead Counsel

is commendable, particularly in light of the legal and factual complexity of this case, the difficulties

of establishing liability and proving damages, and the limited resources available to fund a

settlement.

### 5.    The Requested Fee In Relation To The Settlement

The 30% fee requested in this case is reasonable by every measure, and falls squarely in line

with fees awarded in comparable actions. By way of example, citation to five such cases where

courts awarded fees of 30% or more, all of which occurred in recent years, follows:

- *In re Merry-Go-Round Enterprises, Inc.,* 244 B.R. 327 (Bankr. D. Md. 2000) – $185 million settlement; 40% fee.

- *In re Combustion, Inc.,* 968 F. Supp. 1116 (W.D. La.1997) – $127 million settlement; 36% fee.

- *In re Home-Stake Prod. Co. Sec. Litig,* MDL No. 153 (N.D. Okl. Jan. 2, 1990) – $185 million settlement; 30% fee.

- *In Re Informix Corp. Sec. Litig.,* No. 97-1289 (N.D. Cal Nov. 23, 1999) (Breyer, J.); cited at 21 Class Action Reports 261 (2000)– $132 million settlement; 30% fee.

- *Kurzweil v. Philip Morris Co.,* 94 Civ. 2373 (MBM) & 94 Civ. 2546 (MBM), 1999 U.S. Dist. LEXIS 18378 (S.D.N.Y. 1999) – $123.82 million settlement; 30% fee.

By analogy, courts granting fees in similarly-sized antitrust class actions have not shied away

from granting fees of 30% or more. To list just a few:

- *In re Vitamins Antitrust Litigation,* No. MISC. 99-197(TFH), MDL 1285, 2001 WL 34312839 (D. D.C. July 16, 2001) – $365 million settlement; 33.7% fee.

- *In re: Busiprone Antitrust Litig.,* No. MDL 1413 (JGK), 01-CV-7951 (JGK), 2003

U.S. Dist. LEXIS 26538 (S.D.N.Y Apr. 11, 2003) – $220 million settlement; 33.3% fee.

- *Allapattah Services, Inc. v. Exxon Corp.*, No. 91-0986-CIV-GOLD, 2006 WL 2423784 (S.D. Fla. July 6, 2006) – $1.075 billion settlement; 31.33% fee.

- *In re Linerboard Antitrust Litigation*, MDL No. 1261, 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004) – $202 million settlement; 30% fee.

Academic studies of thousands of class action cases over the previous three decades agree that average court-awarded fees approximate 30%, and are consistent both across jurisdiction and without regard to size of recovery. The Joint Declaration details the findings of 4 such studies, which are summarized below.

- National Economic Research Associates (1996) – average fee of 30%;[11]

- National Economic Research Associates (1999) – average fee of 30%;[12]

- Federal Judicial Center (1996) – average fees of 26%-31%;[13]

- Law and Economics Consulting Center (1996) – average fees of 29%-32%.[14]

A recent study directed by Theodore Eisenberg and Geoffrey P. Miller concluded that between 1993 and 2002 the average award in cases covered by the publication *Class Action Reports*

---

[11]*See* Denise M. Martin, Vinita M. Juneja, Todd S. Foster, Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* (NERA 1996) (examining 66 securities class actions that were settled, dismissed or resolved by jury verdict between January 1991 and December 1994).

[12]*See* Todd S. Foster, Denise M. Martin, Vinita M. Juneja, Frederick C. Dunbar, *Trends in Securities Litigation and the Impact of the PSLRA* (NERA 1999).

[13]*See* Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* (1996) (examining all class settlements in 4 federal district courts between mid-1992 and mid-1994).

[14]*See* Vincent E. O'Brien, *A Study of Securities Class Action Fraud Cases*, 1988-1996 (Law & Economics Consulting Center) (examining 1,280 securities class actions from April 1988 through September 1996).

was 30%. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUDIES, 27, 51 (2004).

Against this backdrop, courts have interpreted the factor presently under consideration as requiring the Court to review the fee requested in terms of the percentage it represents of the total recovery. *See In re Warner*, 618 F. Supp. at 749. The requested fee award of 30% of the Settlement Fund is commensurate with many of the awards made by other courts presiding over class actions in this Circuit. *See, e.g.*, *Silverberg v. People's Bank*, No. 00-9548, 2001 U.S. App. LEXIS 22859, at *4-*5 (2d Cir. Oct. 16, 2001) (affirming district court order awarding attorney's fees and expenses of nearly 33 1/3% of settlement fund); *Hicks v. Morgan Stanley & Co., et al.*, 01 Civ. 10071 (KJH), 2005 U.S. Dist. LEXIS 24890, at *30 (S.D.N.Y. October 24, 2005) (awarding 30% of the settlement fund); *In re The Warnaco Group, Inc. Sec. Litig.*, 00 Civ. 6266 (LMM), 2004 U.S. Dist. LEXIS 13126, at *8-9 (S.D.N.Y. July 13, 2004) (awarding 30% of the settlement fund); *Strougo*, 258 F. Supp. 2d at 262 (awarding fees of 33 1/3 percent); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2002 U.S. Dist. LEXIS 23170, at *1 (S.D.N.Y. Dec. 4, 2002) (awarding one-third of the settlement fund); *Maley*, 186 F. Supp. 2d at 374 (awarding 33% of settlement fund); *Baffa*, 2002 U.S. Dist. LEXIS 10732, at *9 (awarding 30% of the settlement fund).[15]

---

[15]*See also Becher v. Long Island Lighting Co.*, 64 F. Supp. 2d 174, 182 (E.D.N.Y. 1999) (approving fee of one-third, stating that fee was "well within the range accepted by courts in this circuit"); *In re Medical X-Ray Film Antitrust Litig.*, No. 93 CV 5904, 1998 U.S. Dist. LEXIS 14888, at *20 (E.D.N.Y. Aug. 7, 1998) (awarding 33% of approximately $40 million settlement, and concluding award is "well within the range accepted by courts in this Circuit"); *Adair v. Bristol Tech Syst.*, 97 Civ. 5874, 1999 U.S. Dist. LEXIS 17627, at *8-9 (S.D.N.Y. Nov. 16, 1999) (awarding fee of 33% of settlement fund and recognizing courts routinely award 33% or more of settlement fund as fee); *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 313 (S.D.N.Y. 1997), *aff'd sub nom., Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513 (2d Cir. 1998) (noting that 33% of settlement fund Afalls within the normal range of fee awards in similar complex cases@); *In re Crazy Eddie*, 824 F. Supp. at 325-26 (awarding 33.8% of the $42 million settlement fund); *Greene*

The fee requested is also consistent with awards made in similarly complex actions in other jurisdictions throughout the country. *See, e.g., In re Safety Components Int'l*, 166 F. Supp. 2d at 75-6 (listing cases in Second and Third Circuit wherein 30-33% of Settlement Fund awarded); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 152 (E.D. Pa. 2000) (awarding 33-1/3% of settlement fund plus expenses).[16]  In view of the foregoing, the present request for a fee of 30% of the settlement fund is quite reasonable in relation to the fees typically awarded in complex class actions.

### 5.    Public Policy Considerations

Public policy considerations support a substantial fee award, as the Honorable Denise Cote recently explained in *In re WorldCom*, 388 F. Supp. 2d at 359:

> Public policy also supports the approval of this fee request. The size of the recovery achieved for the class - which has been praised even by several objectors - could not have been achieved without the unwavering commitment of Lead Counsel to this litigation. Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment. If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class.

---

*v. Emersons Ltd.*, No. 76 Civ. 2178 (CSH), 1987 U.S. Dist. LEXIS 3980, at *6 (S.D.N.Y. May 20, 1987) (awarding fees and expenses of 42.6% of the settlement fund).

[16]These percentages are consistent with, or even lower than, the contingent fees negotiated in the private marketplace between lawyers and their clients. *See In re Sumitomo*, 74 F. Supp. 2d at 397 (noting that percentage approach is "uniquely the formula that mimics the compensation system actually used by individual clients to compensate their attorneys."); *In re Prudential Bache Energy Income P'ships Sec. Litig.*, MDL No. 888, 1994 U.S. Dist. LEXIS 6621, at *1 (E.D. La. May 18, 1994) ("Were this not a class action, attorneys' fees would range between 30% and 40%, the percentages commonly contracted in contingency cases."); *In re Public Serv. Co.*, No. 91-0536M, 1992 U.S. Dist. LEXIS 16326, at *20 (S.D. Cal. July 28, 1992) ("If this were a non-representative litigation, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery."); *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 U.S. Dist. LEXIS 23595, *40-41 (N.D. Ill. Sept. 14, 1984) (AThe percentages agreed on [in non-class action damage lawsuits] vary, with one-third being particularly common.").

> In order to attract well-qualified plaintiffs' counsel who are able to
> take a case to trial, and who defendants understand are able and
> willing to do so, it is necessary to provide appropriate financial
> incentives. After all, this litigation was conducted on an entirely
> contingent fee basis, and Lead Counsel paid millions of dollars to
> fund the litigation. While some significant recovery in a case of this
> magnitude may seem a foregone conclusion now, the recovery
> achieved here was never certain.

Courts recognize that in addition to providing just compensation, awards of fair attorneys'

fees from a common fund serve to encourage skilled counsel to represent those who seek redress for

damages inflicted on an entire class of persons and to discourage future misconduct of a similar

nature. *See, e.g., Hicks v. Stanley*, No. 01 Civ. 10071, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24,

2005) (Holwell, J.) ("To make certain that the public is represented by talented and experienced trial

counsel, the remuneration should be both fair and rewarding".). Such fee awards must be reasonable

but must also provide "sufficient incentive" for lawyers to make similar efforts in the future. *In re*

*Visa,* 297 F. Supp. 2d at 524.[17] Indeed, the Supreme Court has emphasized that private securities

actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a

necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc., v. Berner,* 472 U.S.

299, 310 (1985) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 432 (1964)).

In this vein, it is significant that Courts in the Second Circuit recognize that attorneys who

produce substantial results in cases such as the case at bar should be rewarded to encourage the legal

community to continue to undertake similar litigations. As stated by the Court in *In re Union*

*Carbide Corp. Consumer Prod. Business Sec. Litig.,* 724 F. Supp. 160, 169 (S.D.N.Y. 1999):

---

[17]Many courts have held that the concept of a private attorney acting as a "private attorney general is vital to the continued enforcement and effectiveness of the Securities Act." *Hicks v. Stanley*, No. 01 Civ. 10071, 2005 WL 2757792, at *9; *In re Warner,* 618 F. Supp. at 750-751.

> The award of attorneys' fees in complex securities class action litigation is informed by the public policy that individuals damaged by violations of the federal securities laws should have reasonable access to counsel with the ability and experience necessary to analyze and litigate complex cases. Enforcement of the federal securities laws should be encouraged in order to carry out the statutory purpose of protecting investors and assuring compliance. *See Bateman Eichler v. Berner,* 472 U.S. 299, 86 L. Ed. 2d 215, 105 S. Ct. 2622 (1985). A large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken. These policies further support the award of a multiplier of counsel's lodestar fee.

*See also Maley,* 186 F. Supp. 2d at 374 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered. Courts have recognized the importance that fair and reasonable fee awards have in encouraging private attorneys to prosecute class actions on a contingent basis pursuant to the federal securities laws on behalf of those who otherwise could not afford to prosecute."); *Ressler v. Jacobson,* 149 F.R.D. 651, 657 (M.D. Fla. 1992) (observing that lawyers that pursue private suits such as this on behalf of investors augment overburdened Securities and Exchange Commission by "acting as 'private attorneys general" and "public policy favors the granting of [attorneys'] fees sufficient to reward counsel for bringing [common fund] actions and to encourage them to bring additional such actions") (citation omitted); *see also In re Visa,* 297 F. Supp. 2d at 524 (citing *Goldberger,* 209 F.3d at 51) ("There is...commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest."); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 161 (1974) ("As the Supreme Court has recognized, without a class action, small claimants individually lack the economic resources to vigorously litigate their rights. Thus, attorneys who take on class action matters enabling litigants to pool their claims provide a huge service to the judicial process."). Absent the efforts of Plaintiffs' Counsel, the Class members would not have obtained relief – and

certainly not relief of the magnitude obtained - for Defendants' alleged activity. Therefore, this
Court should find that this factor militates in favor of granting Lead Counsel 's request for fees and
costs.

### 6.    A "cross-check" of lodestar confirms that the requested fee is reasonable

Lead Counsel's fee for work performed in this case, charged at current hourly rates[18], results
in a total aggregate lodestar of $6,599,020. The requested fee therefore implies a lodestar multiplier
of 2.99, which is consistent with class actions as a whole.[19] The multiplier "represents the risk of
the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the
attorneys, and other factors." *In re Global Crossing*, 225 F.R.D. at 468.

A useful comparison are the billing rates in bankruptcy actions. For example, a fee request
submitted last year by Skadden, Arps, Slate, Meagher & Flom LLP bills more than $16 million for
3½ months of work, at partner rates that average $775/hour (and range from $620 to $835) and at
associate rates that average $448/hour (and range from $295 to $540)

Furthermore, the requested fee encompasses not only past services but services to be rendered
in the future, with respect to this portion of the Litigation, including responses to any objections,
presentation of the Settlement during the Fairness Hearing, responses to the potential appeals of

---

[18]Where "the services were rendered over two or three years, relevant figures for the current
year will normally still be appropriate." *New York State Association for Retarded Children, Inc. v.
Carey*, 711 F.2d 1136, 1153 (2d Cir.1983). *See also Matter of Continental Illinois Securities
Litigation*, 962 F.2d 566, 571 (7th Cir. 1992) (Posner, J.).

[19]Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common
Fund Class Actions*, 24 Class Action Rep. 169 (2003) (studying 1,120 class action settlements and
the multipliers in each); *In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706, 736 n. 44 (E.D. Pa.
2001) (recognizing that a "lodestar multiple in the range of 4.5 to 8.5" is "unquestionably
reasonable" under the cross-check approach); *In re NASDAQ*, 187 F.R.D. at 489 ("multipliers of
between 3 and 4.5 have become common") (quotations omitted).

objectors, if any, and continuing implementation and monitoring of the Settlement and the settlement administration process to ensure that the Settlement Fund is appropriately distributed. The claims process in a case such as this will continue for many months, and responses to Class members' inquiries will require much additional time and attention.

In sum, the multiplier requested by Lead Counsel, 2.99, falls squarely within the range of multipliers normally granted, is well-below the multipliers awarded in mega-fund cases, and thus confirms the reasonableness of the fee requested.

## IV.    CLASS MEMBERS' REACTION TO THE REQUESTED FEE

As of this date, only one class members has seen fit to object properly to Lead Counsel's fee and expense application from the more than 50,000 notices sent to the Class. The paucity of objections, particularly in light of the large number of institutional and other sophisticated investors, strongly favors an award of the requested fee. *See Maley*, 186 F. Supp. 2d at 374. ("The reaction by members of the Class is entitled to great weight by the Court.")

## V.    LEAD COUNSEL ARE ENTITLED TO BE REIMBURSED FOR THEIR REASONABLE LITIGATION EXPENSES

Lead Counsel have incurred out-of-pocket expenses in the amount of $798,880.33 in prosecuting this Litigation, as categorized in the separate affidavits of each petitioning firm in the accompanying Compendium. Lead Counsel request that, in addition to awarding them reasonable attorneys' fees, the Court grant their application for reimbursement of these expenses, which were incidental and necessary to the representation of the Class. *See In re Visa*, 297 F. Supp. 2d at 254 (common practice in Second Circuit to grant expense requests); *Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) (granting reimbursement for reasonable out-of-pocket

expenses incurred and customarily charged to clients) (citation omitted).

## V.    CONCLUSION

The Settlement of this Litigation for $65,875,000 in cash plus interest is the culmination of

the diligent and skillful efforts of Lead Counsel. For these efforts, Lead Counsel respectfully request

that the Court approve and enter an Order for an award of attorneys' fees in the amount of thirty

percent (30%) of the Settlement Fund plus reimbursement of Lead Counsel's expenses in the amount

of $798,880.33, plus interest on these amounts as earned on the Settlement Fund.


Dated: January 11, 2007                    Respectfully submitted,


                                           CAULEY BOWMAN CARNEY
                                             & WILLIAMS, PLLC
                                           By:    /s/ S. Gene Cauley
                                                  S. Gene Cauley (admitted pro hac vice)
                                                  J. Allen Carney (admitted *pro hac vice*)
                                                  Marcus N. Bozeman
                                           11311 Arcade Drive, Suite 200
                                           Little Rock, Arkansas 72221
                                           Telephone: (501) 312-8500
                                           Facsimile: (501) 312-8505

                                           ***Co-Lead Counsel and Coordinating Counsel***

                                           KIRBY McINERNEY & SQUIRE, LLP


                                           By:    /s/ Jeffrey H. Squire
                                                  Jeffrey H. Squire (JS-8910)
                                                  Peter S. Linden (PL-8945)
                                                  Ira M. Press (IP-5313)
                                                  Pamela E. Kulsrud (PK-4310)
                                           830 Third Avenue, 10th Floor
                                           New York, New York 10022
                                           Telephone: (212) 371-6600
                                           Facsimile: (212) 751-2540

                                           ***Co-Lead Counsel***